396 S.E.2d 413

**Harry J. WHITING**

v.

**Evelyn L. WHITING.**

**No. 19049.**

Supreme Court of Appeals of West Virginia.

July 17, 1990.

Dissenting Opinion of Chief Justice Neely July 18, 1990.

Roy David Arrington, Marlinton, for Evelyn L. Whiting.

Walter W. Weiford, Marlinton, for Harry J. Whiting.

MILLER, Justice:

This is an appeal from a final order of the Circuit Court of Pocahontas County, dated May 17, 1988, which granted the parties, Harry J. Whiting and Evelyn L. Whiting, a divorce and ratified and confirmed findings and recommendations of a family law master (master) as to the division of their property. Mrs. Whiting contends on appeal that the trial court erred in not awarding her one-half of a final payment on a note obtained from the sale of the parties' jointly owned real estate and of the funds in the parties' joint bank account at the time they separated. We conclude that these assets were marital property subject to equitable distribution, and we reverse the judgment of the circuit court.

I.

In 1965 Mr. Whiting purchased a residential property in Maryland for $25,500. The property was titled jointly in the names of Mr. Whiting and his first wife, Dorothy Clancy Whiting, as tenants by the entirety. When Dorothy Clancy Whiting died in 1974 or 1975, her one-half interest in the property was placed in trust for her daughter. Mr. Whiting subsequently arranged to repurchase this interest from the trustees.

The parties to this action were married on June 7, 1975. Two days later, on June 9, 1975, the repurchase of the trust interest was consummated. At that time, title to the Maryland property was placed in the names of the parties jointly as tenants by the entirety. In order to accomplish this transaction, the parties borrowed $34,000

from a Maryland savings and loan.[1] The note and deed of trust, also executed on June 9, 1975, were signed by both Mr. and Mrs. Whiting.

The parties lived on the Maryland property until 1981, when they sold it for $120,-000. They financed a portion of the sales price by taking a $20,000 note from the buyers. Mr. and Mrs. Whiting used part of the proceeds from the sale, approximately $54,000, to purchase a home in Marlinton, Pocahontas County, West Virginia. The house in Marlinton was titled in the names of both parties as joint owners. They lived there until June 1, 1985, when they separated.

Sometime thereafter, Mr. Whiting received a check in the amount of $15,022.91, which represented the final payment on the $20,000 note from the sale of the Maryland property. The check was made payable to Mr. Whiting only. He deposited $5,700 in the parties' joint bank account, but kept the remaining $9,322.91 as his own property.

In June of 1986, Mr. Whiting instituted divorce proceedings in the Circuit Court of Pocahontas County. The matter was referred to the master, and a hearing was conducted on June 18, 1987. In his report dated October 20, 1987, the master recommended that the marital home be sold and the proceeds divided equally between the parties. Most of the parties' tangible personal property was divided by agreement.[2] The master recommended that Mr. Whiting be allowed to keep the $9,322.91 remaining from the sale of the Maryland property and the money in the parties' joint bank account on the date of separation. By order dated May 17, 1988, the circuit court ratified and confirmed the findings and recommendations of the master.

## II.

At the outset, we note that the trial court and the master apparently experienced some confusion in applying our equitable distribution statute to the facts of this case. We begin, therefore, with a brief discussion of the statute.

■ Under W.Va.Code, 48–2–32, equitable distribution is a three-step process. The first step is to differentiate between the parties' marital property and their separate property. For purposes of equitable distribution, "marital property" is defined in W.Va.Code, 48–2–1(e)(1) (1986), as "[a]ll property and earnings acquired by either spouse during a marriage, ... regardless of the form of ownership, ... except that marital property shall not include separate property...."[3] "Separate property" is defined in W.Va.Code, 48–2–1(f), as including property acquired by a spouse before the marriage.[4] Whether a particular unit of

---

1. There is some indication in the record that the purchase price was approximately $47,000. Mr. Whiting, however, contends that he was supposed to pay only half of that amount and that he borrowed more than the amount needed to take care of legal fees and settlement charges relating to his first wife's estate. No attempt was made to itemize these expenses or to distinguish them from the loan costs.

2. The parties agree on appeal that the marital home and the tangible personal property were correctly distributed.

3. W.Va.Code, 48–2–1(e)(1), provides in full:
   " 'Marital property' means:
   "(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of shared ownership recognized in other jurisdictions without this state, except that marital property shall not include separate property as defined in subsection (f) of this section[.]"
   An increase in the value of separate property due to the economic or noneconomic contributions of either spouse is also considered "marital property" under W.Va.Code, 48–2–1(e)(2). For the full text of the latter section, see note 19, *infra.*

4. W.Va.Code, 48–2–1(f), provides:
   " 'Separate property' means:
   "(1) Property acquired by a person before marriage; or
   "(2) Property acquired by a person during marriage in exchange for separate property which was acquired before the marriage; or
   "(3) Property acquired by a person during marriage, but excluded from treatment as marital property by a valid agreement of the

property is marital or separate property is primarily a question of law. *Wanberg v. Wanberg,* 664 P.2d 568 (Alaska 1983); *Thomas v. Thomas,* 259 Ga. 73, 377 S.E.2d 666 (1989); *Weiss v. Weiss,* 122 Wis.2d 688, 365 N.W.2d 608 (App.), *review denied,* 122 Wis.2d 783, 367 N.W.2d 223 (1985).

The second step of the process is valuation of the marital property. Under W.Va. Code, 48–2–32(d)(1), the measure of value is the net value of the marital property, ordinarily as of the date of the commencement of the action.[5]

The final step in the equitable distribution process is division of the marital property between the parties. W.Va.Code, 48–2–32(a), provides a presumption of equal division of the marital estate.[6] Under W.Va.Code, 48–2–32(c), this distribution may be altered only if the circuit court determines that equal division of the marital property is inequitable in view of certain economic and noneconomic contributions to or devaluations of the marital estate by either spouse. We recently summarized the provisions of W.Va.Code, 48–2–32(c), in Syllabus Point 1 of *Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988):

"In the absence of a valid agreement, the trial court in a divorce case shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to fault, based on consideration of certain statutorily enumerated factors, including: (1) monetary contributions to marital property such as employment income, other earnings, and funds which were separate property; (2) non-monetary contributions to marital property, such as homemaker services, child care services, labor performed without compensation, labor performed in the actual maintenance or improvement of tangible marital property, or labor performed in the management or investment of assets which are marital property; (3) the effect of the marriage on the income-earning abilities of the parties, such as contributions by either party to the education or training of the other party, or foregoing by either party of employment or education; or (4) conduct by either party that lessened the value of marital property. W.Va.Code § 48–2–32(c) (1986)."

*See also Romine v. Romine,* 180 W.Va. 68, 375 S.E.2d 432 (1988); *Vance v. Vance,* 180 W.Va. 63, 375 S.E.2d 427 (1988). Where an unequal distribution is contemplated, there are additional adjustments that must be considered as set out in W.Va.Code, 48–2–32(d)(2).[7]

In summary, then, equitable distribution under W.Va.Code, 48–2–1, *et seq.,* is a

parties entered into before or during the marriage; or

"(4) Property acquired by a party during marriage by gift, bequest, devise, descent or distribution; or

"(5) Property acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce, annulment or decree of separate maintenance; and

"(6) Any increase in the value of separate property as defined in subdivision (1), (2), (3), (4) or (5) of this subsection which is due to inflation or to a change in market value resulting from conditions outside the control of the parties."

**5.** W.Va.Code, 48–2–32(d), provides, in pertinent part:

"[T]he court shall:

"(1) Determine the net value of all marital property of the parties as of the date of the commencement of the action or as of such later date determined by the court to be more appropriate for attaining an equitable result[.]"

No question of valuation is raised in this appeal.

**6.** W.Va.Code, 48–2–32(a), provides: "Except as otherwise provided in this section, upon every judgment of annulment, divorce or separation, the court shall divide the marital property of the parties equally between the parties." Similar language appears in W.Va.Code, 48–2–32(c). *See* note 22, *infra.*

**7.** W.Va.Code, 48–2–32(d)(2), states:

"(d) After considering the factors set forth in subsection (c) of this section, the court shall:

\* \* \* \* \* \*

"(2) Designate the property which constitutes marital property, and define the interest therein to which each party is entitled and the value of their respective interest therein. In the case of an action wherein there is no agreement between the parties and the relief demanded requires the court to consider such factors as are described in subdivisions one, two, three and four, subsection (c) of this section, if a consideration of factors only under said subdivisions one and two would re-

three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in W.Va.Code, 48-2-32.[8] Courts of other jurisdictions have reached the same conclusion with respect to their equitable distribution statutes. *E.g., Wanberg v. Wanberg, supra; Brandenburg v. Brandenburg,* 83 N.J. 198, 416 A.2d 327 (1980); *Rothman v. Rothman,* 65 N.J. 219, 320 A.2d 496 (1974); *Willis v. Willis,* 85 N.C. App. 708, 355 S.E.2d 828, *rev'd on other grounds,* 86 N.C.App. 546, 358 S.E.2d 571 (1987); *Little v. Little,* 74 N.C.App. 12, 327 S.E.2d 283 (1985); *Smoot v. Smoot,* 233 Va. 435, 357 S.E.2d 728 (1987). *See generally* 27B C.J.S. *Divorce* § 529 at 538 (1986); L. Golden, *Equitable Distribution of Property* § 1.08 (1983); J. Gregory, *The Law of Equitable Distribution* § 2.02 (1989).

█ Unless the parties have made a joint stipulation or a property settlement agreement, under Rule 52(a) of the West Virginia Rules of Civil Procedure the circuit court is required to make findings of fact and conclusions of law in its final order which reflect each step of the equitable distribution procedure.[9] *See Clay v. Clay,* 182 W.Va. 414, 388 S.E.2d 288 (1989); *Romine v. Romine, supra; Somerville v. Somerville, supra.* The same obligation is imposed upon a family law master under W.Va.Code, 48A-4-4(d).[10]

Here, neither the final order of the circuit court nor the master's report contains appropriate findings and conclusions to support the classification or the distribution of the assets questioned by Mrs. Whiting in this appeal. Ordinarily, we would remand this case to remedy this inadequacy in the record. We note, however, that at the time of the hearing before the master in June of 1987, Mr. Whiting was seventy-two years old. Because we believe there is a sufficient factual record from which we can determine the merits of the parties' claims, we deem it in the interest of justice to resolve this dispute without further delay.

---

**8.** To the extent that our *per curiam* opinion in *Vance v. Vance, supra,* suggests that the provisions of W.Va.Code, 48-2-32, are involved in the initial step of classifying the marital and separate property, it is overruled.

sult in an unequal division of marital property, and if an examination of the factors described in said subdivisions three and four produce a finding that a party (A) expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, or (B) conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties, then the court may, in the absence of a fair and just alimony award under the provisions of section fifteen [§ 48-2-15] of this article which adequately takes into account the facts which underlie the factors described in said subdivisions three and four, equitably adjust the definition of the parties' interest in marital property, increasing the interest in marital property of a party adversely affected by the factors considered under said subdivisions three and four who would otherwise be awarded less than one half of the marital property, to an interest not to exceed one half of the marital property."

**9.** In Syllabus Point 1 of *Peoples Bank of Point Pleasant v. Pied Piper Retreat, Inc.,* 158 W.Va. 170, 209 S.E.2d 573 (1974), we stated:

" 'Rule 52(a) mandatorily requires the trial court, in all actions tried upon the facts without a jury, to find the facts specially and state separately its conclusions of law thereon before the entry of judgment. The failure to do so constitutes neglect of duty on the part of the trial court, and if it appears on appeal that the rule has not been complied with, the case may be remanded for compliance.' Point 1 Syllabus, *Commonwealth Tire Company v. Tri–State Tire Company,* [156 W.Va. 351], 193 S.E.2d 544 [ (1972) ]."

*Accord Gorby v. Gorby,* 180 W.Va. 60, 375 S.E.2d 424 (1988); *Jones v. Jones,* 176 W.Va. 438, 345 S.E.2d 313 (1986); *Allen v. Allen,* 173 W.Va. 740, 320 S.E.2d 112 (1984); *Bills v. Bills,* 170 W.Va. 707, 296 S.E.2d 348 (1982); *Spence v. Spence,* 167 W.Va. 704, 280 S.E.2d 307 (1981); *Pierce v. Pierce,* 166 W.Va. 389, 274 S.E.2d 514 (1981).

**10.** W.Va.Code, 48A–4–4(d), states: *"All recommended decisions of the master shall include (1) a statement of findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record;* and (2) the proposed order embodying the appropriate sanction, relief, or denial thereof." (Emphasis added).

## III.

On appeal, Mrs. Whiting's principal contention is that the trial court erred in not awarding her one-half of that portion of the final payment from the sale of the Maryland property that Mr. Whiting kept for himself. She contends that this money was marital property subject to equitable distribution under W.Va.Code, 48–2–32.[11]

Our primary inquiry is whether the final payment from the sale of the Maryland property was a marital asset or Mr. Whiting's separate property. W.Va.Code, 48–2–1(f), includes within the definition of separate property "[p]roperty acquired by a person before marriage ..." and "[p]roperty acquired by a person during marriage in exchange for separate property which was acquired before the marriage[.]"[12]

Any interest Mr. Whiting acquired in the Maryland property as a result of the purchase of the trust's interest two days after his second marriage would fall within the definition of "marital property" contained in W.Va.Code, 48–2–1(e)(1). However, the one-half interest in the property Mr. Whiting claims to have acquired at the death of his first wife could have been considered his separate property at the time of his second marriage within the meaning of W.Va.Code, 48–2–1(f)(1). The question is whether his act of having title to the fee placed in the name of Mrs. Whiting as a joint tenant at the time he acquired the trust's interest had the effect of converting his separate interest into marital property.

There is general agreement that the transfer of separately owned property into joint ownership changes the character of the ownership interest in the property so transferred from nonmarital to marital so that the property is subject to equitable distribution. *E.g., Lewis v. Lewis,* 785 P.2d 550 (Alaska 1990); *Husband T.N.S. v. Wife A.M.S.,* 407 A.2d 1045 (Del.1979); *In re Marriage of Rogers,* 85 Ill.2d 217, 52 Ill. Dec. 633, 422 N.E.2d 635 (1981); *Carter v. Carter,* 419 A.2d 1018 (Me.1980); *Conrad v. Bowers,* 533 S.W.2d 614 (Mo.App.1975); *Pascarella v. Pascarella,* 165 N.J.Super. 558, 398 A.2d 921 (1979); *Parsons v. Parsons,* 101 A.D.2d 1017, 476 N.Y.S.2d 708 (1984); *Quinn v. Quinn,* 512 A.2d 848 (R.I. 1986); *Bonnell v. Bonnell,* 117 Wis.2d 241, 344 N.W.2d 123 (1984).

Many jurisdictions adhering to this general rule conclude that this result is in accord with the partnership concept of marriage which is the basis for equitable distribution.[13] Typical is this observation of the Maine Supreme Court in *Carter v. Carter,* 419 A.2d at 1022:

"Treating the property held in joint tenancy as part of the marital estate fully accords with the principles and purposes of the Uniform [Marriage and Divorce] Act as adopted in Maine. The exception from the definition of marital property for property acquired by gift, Section 722–A(2)(A), has no application to a transfer during marriage from one spouse to both spouses jointly. Such a transfer, in the absence of clear and convincing evidence to the contrary, must be understood as evidencing an intention to transfer the property to the marital estate....

"This conclusion is consistent with the fundamental conception of marriage, having its roots in community property law, as a partnership or shared enterprise."

In these jurisdictions, the transfer to joint title is often viewed as a gift to the marital estate. *In re Marriage of Rogers, supra;*[14] *Conrad v. Bowers, supra.*

---

**11.** Neither party raises a conflict of law issue. Because the parties were living in West Virginia at the time the final $15,000 payment was made in 1985, our equitable distribution statute would apply.

**12.** For the complete text of W.Va.Code, 48–2–1(f), see note 4, *supra.*

**13.** Commentators have used much the same reasoning. *See* Golden, *supra* § 5.27; J. Krauskopf, *Classifying Marital and Separate Property—Combinations and Increase in Value of Separate Property,* 89 W.Va.L.Rev. 997 (1987).

**14.** In 1984, the Illinois legislature amended its equitable distribution statute to make it clear that a transfer of separate property to a co-ownership form will make it marital property. *See In re Marriage of Nagel,* 133 Ill.App.3d 498, 88 Ill.Dec. 584, 478 N.E.2d 1192 (1985); Ill.Ann.

We have recognized the concept of marriage as a partnership or shared enterprise. In *Dyer v. Tsapis*, 162 W.Va. 289, 291–92, 249 S.E.2d 509, 511 (1978), we stated: "The law which once saw marriage as a sacrament now conceptualizes it as roughly analogous to a business partnership." (Footnote omitted). In *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983), we confirmed this characterization of marriage by concluding that contributions of traditional domestic services were as worthy of consideration in the distribution of the marital estate as monetary contributions. The equitable distribution provisions adopted by the legislature in 1984 following our decision in *LaRue* incorporated this partnership concept of marriage into our statutory divorce law.[15]

Prior to the enactment of our equitable distribution statute in 1984, W.Va.Code, 48–3–10 (1931) established a presumption of a gift of separate property where one spouse purchased property, but placed title in the name of the other. Where the title was put in the names of both spouses jointly, there was a presumption that the purchaser "intended one-half of the money paid and the half interest so conveyed to be a gift" to the other spouse. *Dodd v. Hinton*, 173 W.Va. 69, 71, 312 S.E.2d 293, 295 (1984).[16]

When the legislature enacted the equitable distribution provisions of our divorce law, it abolished the presumption of interspousal gift in equitable distribution cases.[17] In *Roig v. Roig*, 178 W.Va. 781, 785, 364 S.E.2d 794, 798 (1987), we recognized the demise of the presumption of an interspousal gift of separate property in such cases and explained that the party asserting such a gift must now affirmatively prove it:

"[I]t was obviously the intent of the legislature to allow one spouse to transfer property to the other spouse by irrevocable gift and thereby remove the assets so transferred from inclusion in the marital estate. However, in keeping with the spirit of *Code*, 48–3–10 [1984], in order for property that is transferred from one spouse to the other during marriage to be excluded from the marital property pool, there must be proof that the property was intended as an irrevocable gift.... In all instances, the burden of proof is upon the spouse who would claim the gift."

Thus, we concluded in *Roig* that although it was still possible to make an irrevocable gift of separate property to a spouse, the burden of proving such gift is now on the spouse who claims it. *Roig* did not address gifts to the marital estate.

Stat. ch. 40, ¶ 503(b) (Smith–Hurd 1990 Cum. Supp.).

**15.** W.Va.Code, 48–2–36, makes the concept of equitable distribution of property retroactive so long as the divorce action was filed after May 25, 1983. In *LaRue v. LaRue*, 172 W.Va. at 171–172, 304 S.E.2d at 325, we discussed, by way of dictum, cases from other jurisdictions which have upheld the retroactivity of equitable distribution of property: "In such cases, the claim is usually made that the statute should not apply to a divorce where the marriage occurred prior to the effective date of the statute, because that application would impair existing contracts and violate due process. These claims have been uniformly denied." (Citations omitted).

**16.** In *Dodd*, we recognized that prior to the enactment of W.Va.Code, 48–3–10, we had a common law presumption that a husband who titled property jointly with his wife was presumed to have made a gift to her of the one-half interest. *See Coffman v. Coffman*, 108 W.Va. 285, 150 S.E. 744 (1929); *Effler v. Burns*, 70

W.Va. 415, 74 S.E. 233 (1912). The Reviser's Note to W.Va.Code, 48–3–10 (1931), states: "This section is new. It is intended to equalize the position of husband and wife in such transactions."

**17.** The 1984 amendment to W.Va.Code, 48–3–10, added the underlined proviso:

"Where one spouse purchases real or personal property and pays for the same, but takes title in the name of the other spouse, such transaction shall, in the absence of evidence of a contrary intention, be presumed to be a gift by the spouse so purchasing to the spouse in whose name the title is taken: *Provided, That in the case of an action under the provisions of article two [§ 48–2–1 et seq.] of this chapter wherein the court is required to determine what property of the parties constitutes marital property and equitably divide the same, the presumption created by this section shall not apply, and a gift between spouses must be affirmatively proved.*" (Emphasis added).

W.Va.Code, 48–2–1(e)(1), defining *all* property acquired during the marriage as marital property except for certain limited categories of property which are considered separate or nonmarital, expresses a marked preference for characterizing the property of the parties as marital property. We believe it is reasonable to conclude that the legislative rejection of the presumption of interspousal gifts in equitable distribution cases was intended to prevent the automatic creation of separate property interests during marriage merely by reference to the manner in which the property was titled. We recognized as much in *Roig, supra.* Instead, we believe that W.Va. Code, 48–3–10 (1984), is consistent with the view of other jurisdictions that joint titling implies a gift to the marital estate, as we have earlier pointed out.

If this were not the intended result, it would be extremely difficult for a spouse to claim an interest in jointly titled property for which the other spouse paid most of the consideration. Absent affirmative proof of an unequivocal gift of separate property in such circumstances, the joint property of the spouses would be held to be the separate property of only one despite documentary proof of co-ownership and an express statutory preference for marital property in equitable distribution cases. We do not believe the legislature intended such a regressive result. Instead, by recognizing that the transfer of title to the names of both husband and wife reflects an intent to donate the property to the marital estate, we give basic credence to the act of making a joint title and to the partnership or shared enterprise concept of marriage.

■ We, therefore, hold that where, during the course of the marriage, one spouse transfers title to his or her separate property into the joint names of both spouses, a presumption that the transferring spouse intended to make a gift of the property to the marital estate is consistent with the principles underlying our equitable distribution statute.

■ We stress that the joint titling of the separate property gives rise only to a rebuttable presumption of gift to the marital estate. The presumption may be overcome by a showing that the transferring spouse did not intend to transfer the property to joint ownership [18] or was induced to do so by fraud, coercion, duress, or deception. *See Bonnell v. Bonnell, supra; Trattles v. Trattles,* 126 Wis.2d 219, 376 N.W.2d 379 (App.1985).

It is often argued by the transferring spouse that the real reason for the transfer into joint title during the marriage was to avoid taxes or other adverse consequences of separate ownership, and that, therefore, no gift to the marital estate was intended. Courts have uniformly rejected this argument on the ground that it does not deny the title transfer, but only states the reason for making the gift. *E.g., In re Marriage of Moncrief,* 36 Colo.App. 140, 535 P.2d 1137 (1975); *Carter v. Carter, supra; Coffey v. Coffey,* 119 A.D.2d 620, 501 N.Y. S.2d 74 (1986); *McLean v. McLean,* 323 N.C. 543, 374 S.E.2d 376 (1988); *Lowry v. Lowry,* 375 Pa.Super. 382, 544 A.2d 972 (1988); *Brown v. Brown,* 352 Pa.Super. 267, 507 A.2d 1223 (1986).

■ Nor is this result inconsistent with W.Va.Code, 48–2–1(e)(2), which provides for a marital property component to separate property to the extent that the value of the separate property is increased by the expenditure of marital resources.[19] In this

---

**18.** In determining intent, courts have looked to factors such as the utilization of the jointly owned property for marital purposes as further indicia that the transfer to joint ownership was intended to make the property marital. *Burgess v. Burgess,* 710 P.2d 417 (Alaska 1985); *Boyce v. Boyce,* 694 S.W.2d 288 (Mo.App.1985); *Quinn v. Quinn, supra; Trattles v. Trattles,* 126 Wis.2d 219, 376 N.W.2d 379 (App.1985).

**19.** W.Va.Code, 48–2–1(e)(2), provides, in pertinent part:

"'Marital property' means:

\* \* \* \* \* \*

"(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate prop-

instance, the statute permits a tracing of the parties' respective contributions to the property in order to determine the marital and nonmarital components. Obviously, this statute has no application where the property has been jointly titled and the presumption of gift to the marital estate has not been rebutted.

Some jurisdictions have, in the absence of a specific statute like W.Va.Code, 48–2–1(e)(2), adopted a "source of funds" or tracing theory of equitable distribution in divorce cases where there has been no joint titling after the marriage. A typical statement of this doctrine appears in *Harper v. Harper*, 294 Md. 54, 80, 448 A.2d 916, 929 (1982):

> "Under [the source of funds] theory, when property is acquired by an expenditure of both nonmarital and marital property, the property is characterized as part nonmarital and part marital. Thus, a spouse contributing nonmarital property is entitled to an interest in the property in the ratio of the nonmarital investment to the total nonmarital and marital investment in the property. The remaining property is characterized as marital property and its value is subject to equitable distribution."

*Accord Thomas v. Thomas*, 259 Ga. 73, 377 S.E.2d 666 (1989); *Brandenburg v. Brandenburg*, 617 S.W.2d 871 (Ky.App.1981); *Hall v. Hall*, 462 A.2d 1179 (Me.1983); *Tibbetts v. Tibbetts*, 406 A.2d 70 (Me.1979); *Hoffmann v. Hoffmann*, 676 S.W.2d 817 (Mo.1984); *Wade v. Wade*, 72 N.C.App. 372, 325 S.E.2d 260, *disc. review denied*,

313 N.C. 612, 330 S.E.2d 616 (1985). *See generally* 27B C.J.S. *Divorce* § 521 at 523.

Even in these jurisdictions, however, it is generally recognized that there is nothing in the source of funds rule that is incompatible with the concept of a gift to the marital estate resulting from the transfer of separate property into the joint names of both spouses. As the Missouri Court of Appeals stated in *Kramer v. Kramer*, 709 S.W.2d 157, 159 (Mo.App.1986): "[W]e find nothing in that [rule] which prevents a spouse, by his [or her] own agreement, express or implied, or by gift, from transmuting an item of separate property into marital property." *See also Carter v. Carter, supra; McLean v. McLean, supra; McLeod v. McLeod*, 74 N.C.App. 144, 327 S.E.2d 910, *cert. denied*, 314 N.C. 331, 333 S.E.2d 488 (1985), *overruled on other grounds, Johnson v. Johnson*, 317 N.C. 437, 346 S.E.2d 430 (1986).

Indeed, we are aware of only one jurisdiction, Maryland, which applies the source of funds doctrine, with its tracing of marital and individual contributions, in cases where there has been a transfer of separate property to joint title after the marriage. We note, however, that the Maryland equitable distribution statute expressly excludes from consideration in the definition of "marital property" property "directly traceable" to nonmarital property.[20] Consequently, as the Maryland Court of Appeals concluded in *Grant v. Zich*, 300 Md. 256, 477 A.2d 1163 (1984), the idea that separate property can become marital property solely by virtue of a transfer of title to joint ownership is entirely inconsistent with the Maryland statute.

---

erty, or (B) work performed by either or both of the parties during the marriage."

**20.** Md.Code Ann., Family Law, § 8–201(e) (1984) provides:
"*Marital property.*—(1) 'Marital property' means the property, however titled, acquired by 1 or both parties during the marriage. (2) 'Marital property' does not include property:
(i) acquired before the marriage;
(ii) acquired by inheritance or gift from a third party;
(iii) excluded by valid agreement; or
(iv) directly traceable to any of these sources."

The North Carolina equitable distribution statute is similar in that it specifies that property acquired during the marriage in exchange for separate property "shall remain separate regardless of whether the title is in the name of the husband or wife or both[.]" N.C.Gen.Stat. § 50–20(b)(2) (1987). *See Mims v. Mims*, 305 N.C. 41, 286 S.E.2d 779 (1982). Yet, North Carolina recognizes a presumption of gift to the marital estate arising from the transfer of separately owned real property to joint title. *E.g., McLean v. McLean, supra; McLeod v. McLeod, supra.* North Carolina does not apply this rule to joint bank accounts. *See* note 25, *infra.*

■ We conclude that the source of funds doctrine is ordinarily not available to characterize as separate property that property which has been transferred to joint title during the marriage. Tracing the parties' contributions to classify the property as marital or nonmarital ignores the effect of the joint titling of property and is incompatible with the partnership concept of marriage. We agree with this statement from Golden, *supra* § 5.29 at 126:

> "At a very basic level [the source of funds doctrine] does not reflect the realities of marriage; married partners tend to pool their resources and this obliterates the separate identities of property. The law of tracing actually discourages this sharing and rewards spouses who keep a running account of what is theirs. One can only surmise that the marital bonds are not strengthened by such a practice. In addition, the proof problems of tracing assets can be so substantial that the expense of litigation is often not worth the effort."

This is not to say that the contributions of the parties can never be considered. The origins of separately titled property may be traced to establish that it is the separate property of one spouse, acquired by one of the means listed in W.Va.Code, 48–2–1(f). Moreover, tracing of each spouse's contributions is permitted at the division stage of the equitable distribution process when the trial court determines that the presumption of an equal division of marital property under W.Va.Code, 48–2–32(a) and –32(c), should not apply.[21] Among the factors to be considered by the court in determining whether to alter the division of marital property is the expenditure of separate property to acquire or improve marital property.[22]

Here, two days after their marriage, Mr. Whiting transferred title to the Maryland property into his and Mrs. Whiting's names jointly. Mr. Whiting is therefore presumed to have donated whatever separate interest he may have had in the property to the marital estate. The property is presumed to have been marital in character, and, as no evidence was offered to rebut the presumption, the proceeds of its sale were also marital property within the meaning of our equitable distribution statutes.

Nor was any evidence offered below in a serious attempt to overcome the statutory presumption of equal division of the marital estate. The record did show that Mr. Whiting devoted considerable time and skill to making improvements to the parties' real estate. No evidence of the value of these services was offered. It also appears, however, that Mrs. Whiting earned approximately three times as much as Mr. Whiting during the marriage. In any event, Mrs. Whiting is requesting only one-half of the remainder of the final payment.

In summary, then, we conclude that the real estate in Maryland was marital property within the meaning of our equitable distribution law and that the proceeds from the sale of such property were, therefore, also marital property. In the absence of evidence overcoming the statutory presumption of equal distribution of the property, Mrs. Whiting was entitled to one-half of the proceeds of the sale of such property.[23] Accordingly, we conclude that the

---

**21.** For the text of W.Va.Code, 48–2–32(a), see note 6, *supra.*

**22.** W.Va.Code, 48–2–32(c), provides, in pertinent part:

> "In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:
>
> "(1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:
>
> "(A) Employment income and other earnings; and
>
> "(B) Funds which are separate property."

**23.** We emphasize that with the exception of this final payment and the joint bank account discussed in Section IV, *infra,* all of the parties' other property was divided equally, apparently to their satisfaction. We are not, therefore, considering these items in isolation from the rest of the marital estate.

circuit court erred in allowing Mr. Whiting to keep the entire $9,322.91 remaining from the final payment. We reverse the decision of the trial court, and we remand for entry of an order requiring him to pay her one-half of that amount.

## IV.

■ Mrs. Whiting also asserts that she is entitled to one-half of the funds Mr. Whiting withdrew from their joint bank account shortly after they separated. It is asserted that prior to the separation, Mr. Whiting sold a number of items of tangible personal property at an auction and deposited the proceeds in the joint bank account. In August, 1985, Mr. Whiting withdrew $2,020 from the account. He gave Mrs. Whiting $20.00 and used the remainder to take a hunting trip. Mrs. Whiting contends that she is entitled to one-half of the money withdrawn after deduction of the $20.00 she already received. Mr. Whiting contends that his deposits in the joint account were realized from the sale of his own separate property [24] and should be returned to him as such.

Many of the principles we recited in the previous section in discussing Mrs. Whiting's entitlement to the proceeds of the sale of the Maryland residence are applicable to joint bank accounts as well. Thus, for purposes of classification in equitable distribution cases, a number of jurisdictions have concluded that one spouse's deposit of separate funds into a jointly titled bank account changes the character of such funds from nonmarital to marital property subject to equitable distribution. *See, e.g., Husband T.N.S. v. Wife A.M.S.*, 407 A.2d 1045 (Del.1979); *In re Marriage of Emken*, 86 Ill.2d 164, 56 Ill.Dec. 45, 427 N.E.2d 125 (1981).[25]

Moreover, this is consistent with our general rule with regard to disposition of joint bank accounts, which was stated in Syllabus Point 1 of *Conner v. Conner*, 175 W.Va. 512, 334 S.E.2d 650 (1985):

> " 'Prior to the death of a donor depositor, a rebuttable presumption exists under the provisions of Code, 31A–4–33, as amended, that the ownership of the funds is joint, a presumption which may be overcome by competent evidence.' Syllabus Point 3, *Dorsey v. Short*, 157 W.Va. 866, 205 S.E.2d 687 (1974)."

*Accord McComas v. McComas*, 178 W.Va. 133, 358 S.E.2d 217 (1987). The marital or nonmarital character of the funds before deposit is not a determinative factor. In *Simmons v. Simmons*, 171 W.Va. 170, 174, 298 S.E.2d 144, 147 (1982), we rejected the assertion that funds in a joint account were the sole property of the spouse who contributed the funds: "[T]his factor is not dispositive of the issue. Under the provisions of W.Va.Code § 31A–4–33 and our holding in *Dorsey v. Short, supra,* once funds are deposited in a joint banking account, they are presumed to be jointly owned. The source of the funds is irrelevant." We further recognized that "withdrawal of the funds by the donor depositor does not conclusively rebut the presumption...." 171 W.Va. at 174, 298 S.E.2d at 147. *See also McComas v. McComas, supra; Conner v. Conner, supra.*

Thus, we believe that under W.Va.Code, 31A–4–33 (1969), where separate funds are deposited in a joint account in the names of both husband and wife, such funds are presumed to be marital property for purposes of equitable distribution. For the reasons stated above, we conclude that the funds in the parties' joint bank account constituted marital property within the meaning of W.Va.Code, 48–2–1(e)(1). Ac-

---

**24.** This assertion was disputed by Mrs. Whiting. No evidence was offered to prove the nonmarital character of the items Mr. Whiting sold at auction.

**25.** Some courts have permitted classification by tracing in joint bank accounts. *See Allen v. Allen,* 584 S.W.2d 599 (Ky.App.1979). North Carolina arrives at this result by virtue of its statute, N.C.Gen.Stat. § 50–20(b)(2) (1987),

which provides that "[p]roperty acquired in exchange for separate property shall remain separate regardless of whether the title is in the name of the husband or wife or both and shall not be considered to be marital property unless a contrary intention is expressly stated in the conveyance." *See Manes v. Harrison–Manes,* 79 N.C.App. 170, 338 S.E.2d 815 (1986); *Brown v. Brown,* 72 N.C.App. 332, 324 S.E.2d 287 (1985).

cordingly, the trial court erred in not awarding one-half of those funds to Mrs. Whiting in its distribution of the parties' marital assets.

## V.

Mrs. Whiting also challenges the circuit court's ratification of the master's findings as to attorney's fees and costs. In his final report, the master recommended that Mrs. Whiting pay Mr. Whiting's attorney's fees and the statutory family law master fee incurred in the conduct of a supplemental hearing on October 15, 1987.[26] The master based his recommendation on his finding that in conducting the supplemental hearing, "additional time was spent by the undersigned which should be paid by [Mrs. Whiting], who requested determinations of the above matters[.]"

The finding that Mrs. Whiting was responsible for the further proceedings is not supported by the evidence. The record clearly reveals that it was Mr. Whiting who requested the supplemental hearing by motion filed with the circuit court on August 25, 1987. The master's finding should not, therefore, have been adopted by the circuit court.[27] Accordingly, we reverse the judgment of the circuit court on this point as well.

## VI.

■ Finally, on cross-assignment of error, Mr. Whiting asserts that we should remand the case for further hearings. We conclude, however, that further hearings would unnecessarily delay resolution of this dispute. Mr. Whiting was afforded an opportunity to present his evidence at the June, 1987 hearing. Although we have, in this appeal, accepted as true those facts most favorable to him, we still conclude that Mrs. Whiting is entitled to prevail on her claims. In such circumstances, further hearings would be futile.

## VII.

For the reasons stated above, we reverse the judgment of the Circuit Court of Pocahontas County insofar as it is in conflict with this opinion. We remand the case to that court with instructions to enter an order compelling Mr. Whiting to pay Mrs. Whiting one-half of the contested portion of the final payment on the Maryland property and of the funds withdrawn from the joint bank account after the separation. In addition, we direct the court to rescind the prior order compelling Mrs. Whiting to pay costs and attorney's fees attendant to the October, 1987 hearing.

Reversed and remanded with instructions.

NEELY, Chief Justice, dissenting:

The majority opinion is wrong—wrong in its understanding of human nature, wrong in its statutory interpretation and wrong in its analysis of legislative intent.

---

**26.** The June, 1987 hearing was cut short to afford the parties an opportunity to settle the property division issue. When the negotiations fell through, the circuit court ordered the supplemental hearing. It appears that no additional evidence was offered at the October, 1987 hearing and that no transcript was made. In any event, no transcript of the supplemental hearing appears in the record before this Court.

**27.** W.Va.Code, 48A-4-10, states the circuit court's obligations in reviewing a family law master's report. W.Va.Code, 48A-4-10(c), provides:

"The circuit court shall examine the recommended decision of the master, along with the findings and conclusions of the master, and may enter an order in conformance with the recommended decision, may recommit the case, with instructions, for further hearing before the master or may, in its discretion, enter an order upon different terms, as the ends of justice may require. The circuit court shall not follow the recommendation, findings, and conclusions of a master found to be:

"(1) Arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the law;

"(2) Contrary to constitutional right, power, privilege, or immunity;

"(3) In excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(4) Without observance of procedure required by law;

"(5) Unsupported by substantial evidence; or

"(6) Unwarranted by the facts."

## I.

Most married persons do not contemplate divorce. Ninety-nine percent believe that their marriage will beat the odds and that they will fulfill their marital promises until death parts them. Because the marriage is expected to continue, most spouses use, title and transfer property for the benefit of the marriage and their partners. However, if the marriage ends in a divorce, neither party intends unjustly to enrich the other.

If one partner separates property, even if separately owned, from the couple's assets, the other partner's most likely reaction is to question the viability of the marriage. The very act of pigeonholing property—his, hers, ours—undermines the marriage. Sedulously protecting separate property at every transfer, renewal, reinvestment or exchange will weaken a marriage by emphasizing and reemphasizing the viability of the divorce option.

In addition to the psychological reassurance to one's spouse of a commitment to the marriage, married couples have three major practical incentives to commingle their assets: (1) the federal estate tax exemption; (2) protection from creditors; and, (3) ease of administration, both before and after death.

Couples who have amassed substantial wealth want to pay the least tax legally possible. By taking advantage of federal estate tax deductions, credits and low rates (rates begin at 35% and mount quickly to 50%), a married couple can transfer up to $1,200,000 to their children without paying federal estate taxes and the remaining estate is then subject to lower rates.[1] Jointly titled property, or property transferred from one spouse with an excess of property titled in his or her name to the other spouse's name, allows a married couple to reduce the tax liability that occurs at the death of one spouse and increases the amount passed tax free to the children.

Protection of assets from creditors is another incentive to title property jointly. Some couples struggle every month to pay bills and their only asset is a house that they want to protect from creditors by titling it jointly. Other married couples may have one spouse who engages in business activities that produce substantial contingent liabilities. If the spouse subject to the liability is also the primary support for the family and has most assets titled in his name alone, that spouse's assets, either marital or separate, should be jointly titled to protect at least part of them from creditors. *W. Va. Code*, 48–3–10 [1984], protects a portion of jointly titled property from creditors because it creates a presumption of gift between the spouses; and the creditor can reach *only* the debtor spouse's share of the jointly titled property. Furthermore, reaching the debtor's share when property is jointly titled involves expensive litigation that makes the whole undertaking uneconomical. *See Harris v. Crowder*, 174 W.Va. 83, 322 S.E.2d 854 (1984). At the end of the day most disputes between debtors and creditors are settled, and joint title gives the debtor the edge in settlement negotiations.

Finally most couples jointly title property for ease of administration, both before and after death. Either spouse can renew the car tags, pay the property tax, redeem the bonds and, when necessary, transfer, invest or liquidate property. Joint title also is used to avoid probate which reduces paperwork, expenses, and delay. At the

---

1. By using the unlimited marital deduction, 26 U.S.C. § 2056, and the unified credit, 26 U.S.C. § 2010, a husband and wife can pass up to $1,200,000 to second generation beneficiaries without paying federal estate taxes. To accomplish this result, a testamentary trust is set up and funded at $600,000, the amount exempted from federal income tax under the unified credit. The surviving spouse's interest in the testamentary trust should be limited to a life interest; the remainder beneficiaries are usually the couple's children. This trust design is frequent-ly called the Estate Tax Credit Preservation Trust. The estate in excess of $600,000 would pass to the surviving spouse without any federal estate tax liability under the unlimited marital deduction. At the death of the surviving spouse, that second estate would also receive a unified credit up to $600,000. Federal estate tax liabilities can be reduced further by other estate tax credits, and by gifts under the annual gift exclusion, 26 U.S.C. § 2503(b) ($10,000 gift exclusion). Gibbs, "Basic Federal Estate and Gift Taxation," 17 *St. Mary's L.J.* 809 (1986).

death of a spouse, jointly titled property can be quickly and easily transferred to the living spouse. The widow/widower can use or sell the property immediately.

Jointly titled property benefits almost all married couples, middle class as well as rich and poor. However, under the majority opinion the benefits of joint title that were available under the old law as enacted by the legislature (*see* section III *infra*) are now outweighed by the possibility of loss through a divorce.

The majority opinion's presumption that jointly titled property which would otherwise qualify as "separate property" is a gift to the marital estate is not based on an accurate understanding of the functioning of most couples. Aunt Minerva's quilt, although used by both spouses, really belongs to her niece. Mother's house really belongs to her daughter. Grandpa John's watch and stock really belong to his grandson. Most people jointly title separate property as a gift, but a gift conditioned on the couple's remaining married.

By creating a presumption in favor of marital property at the time of divorce based on mere title, the majority rewards spouses who, by keeping the property in only their names, refuse to allow the marital unit to use their separate property, and punishes spouses who allow the marital unit to use their separate property. The generous and caring spouses end up in a divorce losing part of their separate property.

Although I applaud the majority's concern that the family unit be financially secure, its approach (redistributing separate property of the unwary to the marital estate) will fail because it's based on a misunderstanding of human nature. The majority probably believes that their interpretation of our divorce statute will help homemakers in a divorce by increasing the marital property subject to equitable distribution. But today's shortsighted action in temporary redistribution is similar to policies we regularly observe in the Third World where productive assets are distributed to favored political groups never to be replaced.

In this regard, perhaps the best example of Third World political redistribution occurred in Uganda during the 1970's. President Amin, attempting to increase the Black Africans' economic share, expropriated the Asian Indian store owners and distributed their assets to inexperienced Black followers of the regime. Those who received this unexpected boon ate the food, used up the supplies, and then quickly went out of business. Uganda's economy ground to a halt and many starved for lack of a sophisticated distribution network.[2] Alas, the majority, similar to President Amin, looks only to the short run benefits to a favored constituency and fails to see longer term problems of killing the fabled golden-egg-laying goose.

Divorce law, along with criminal law, quickly becomes known to people who potentially are affected by it. Many prison inmates know more procedural and substantive criminal law than recent law school graduates. The reason for their knowledge, of course, is that criminal law directly affects their current condition. In divorce law today's majority opinion will catch those so naive as to have relied on the old law, but when the majority opinion's redistribution effect becomes generally known, spouses will individually title their separate property.

Family security will be hurt by this decision. During the marriage, spouses will question which is more likely, death or divorce? Other spouses who believe divorce a bare possibility will still ask who is more likely to get my money, creditors or my spouse? Still others will question whether the ease of administration is worth losing half the property in a divorce. Spouses will keep their separate property titled individually and the family will not have the financial benefits of joint titling or tax-saving interspousal transfers. In the end the family loses financially and emo-

---

**2.** *See* V.S. Naipaul, *A Bend in the River* (1979), for an accurate, although fictional account of Uganda's redistribution.

tionally, and this loss occurs in all marriages and not just those ending in a divorce.

## II.

Not only is the majority's opinion based on a misunderstanding of human nature, but it fails to follow the law. According to our equitable distribution statute, at the time of a divorce, property is classified based on how and when the property was acquired. For example, marital property includes: "All property and earnings *acquired* ... during the marriage ... regardless of the form of ownership ..." (Emphasis added), *W.Va.Code*, 48–2–1–(e) [1986][3]; and separate property includes: "(1) Property *acquired* ... before marriage; or (2) ... *acquired* ... in exchange ..., or (3) ... *acquired* ... during a marriage but excluded ... by a valid agreement ...; or (4) ... *acquired* ... by gift, bequest, devise, descent or distribution; or

(5) ... *acquired* ... after the separation ...; or (6) Any increase in the value of separate property ..." (Emphasis added), *W.Va.Code*, 48–2–1(f) [1986].[4] Neither type of property is preferred; rather, property is classified not according to its form of ownership but on how and when it was *acquired*. This dual property system was adopted because of "essentially common-sense extrapolations of fairness notions and beliefs about spouses' expectation." Levy, "An Introduction to Divorce–Property Issues," 23 *Fam.L.Q.* 147, 152 (1989).

Additional evidence of the legislature's intention to classify property according to its means of acquisition rather than its title is found in the proviso added to *W.Va. Code*, 48–3–10 in 1984 as part of our equitable distribution statute. The added proviso requires, at the time of a divorce, that "gift between spouses must be affirmatively proven."[5] Certainly for separate

---

**3.** The complete definition of marital property found in *W.Va.Code*, 48–2–1(e) [1986], is:

(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other *form of shared ownership recognized in other* jurisdictions without this state, except that marital property shall not include separate property as defined in subsection (f) of the section; and

(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate property, or (B) work performed by either or both of the parties during the marriage.

The definitions of "marital property" contained in this subsection and "separate property" contained in subsection (f) of this section shall have no application outside the provisions of this article, and the common law as to the ownership of the respective property and earnings of a husband and wife, as altered by the provisions of article three [§ 48–3–1 et seq.] of this chapter and other provisions of this code, are not abrogated by impli-

cation or otherwise, except as expressly provided for by the provisions of this article as such provisions are applied in actions brought under this article or for the enforcement of rights under the article.

**4.** The complete definition of separate property found in *W.Va.Code*, 48–2–1(f) [1986], is:

(1) Property acquired by a person before marriage; or

(2) Property acquired by a person during marriage in exchange for separate property which was acquired before the marriage; or

(3) Property acquired by a person during marriage, but excluded from treatment as marital property by a valid agreement of the parties entered into before or during the marriage; or

(4) Property acquired by a party during marriage by gift, bequest, devise, descent or distribution; or

(5) Property acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce, annulment or decree of separate maintenance; and

(6) Any increase in the value of separate property *as defined in subdivision (1), (2), (3), (4) or (5)* of this subsection which is due to inflation or to a change in market value resulting from conditions outside the control of the parties.

**5.** *W.Va.Code*, 48–3–10 [1984], with the added underlined proviso, states:

Where one spouse purchases real or personal property and pays for the same, but takes

property to become martial property there must be a gift. By adding the amendment to *W. Va. Code,* 48–3–10 [1984], the legislature indicated that although title alone was sufficient to protect property from creditors, mere title was not sufficient to prove ownership in a contest between the spouses at the time of divorce and affirmative proof of a gift was required.[6]

### III.

The majority opinion is based on the unsupported inference that the legislature, in passing our equitable distribution statute, had a "marked preference for ... marital property," (Slip Op. 14) and based on that "presume[s property jointly titled] to be marital property for purposes of equitable distribution." The majority's analysis of legislative intent is not based on the language found in the equitable distribution statute, which classifies property according to how and when the property was acquired. (*See supra* section II, for the statutory definitions of marital property and separate property.) Our statute's dual definition indicates no "marked preference" for either type of property; rather, classification of property depends on how and when the property was "acquired" and not its title. The legislature's intent to create a dual property system is also shown by the provision added to *W. Va. Code,* 48–3–10

title in the name of the other spouse, such transaction shall, in the absence of evidence of a contrary intention, be presumed to be a gift by the spouse so purchasing to the spouse in whose name the title is taken: *Provided, That in the case of an action under the provisions of article two [§ 48–2–1 et seq.] of this chapter wherein the court is required to determine what property of the parties constitutes marital property and equitably divide the same, the presumption created by this section shall not apply, and a gift between spouses must be affirmatively proved.*

**6.** The majority opinion misstates our holding in *Roig v. Roig,* 178 W.Va. 781, 364 S.E.2d 794 (1987) and in effect returns to *Hamstead v. Hamstead,* 178 W.Va. 23, 357 S.E.2d 216 (1987) that we specifically overruled in Syllabus Point 4, *Roig supra.* The majority also ignores our cases that recognized the dual property system and adopted a "source of funds" theory for classifying property. *See Shank v. Shank,* 182 W.Va. 271, 387 S.E.2d 325 (1989) (in which

[1984], requiring that at the time of a divorce, a gift between the spouses be affirmatively proven.

Furthermore, to add insult to injury in the "legislative intent" game, the majority's opinion is based on a version of the equitable distribution statute that was actually *rejected* by the legislature. The Senate version of the equitable distribution statute, according to the *Journal of the House of Delegates* (1984) 529–42, proposed the following definition of marital property:

> All property, whether real or personal, and earnings, acquired by either party during the marriage is *rebuttably presumed to be marital property regardless of whether title is held individually or in trust for a party or by the parties in some form of co-ownership such as joint tenancy, tenancy in common or tenancy by the entirety,* except:
>
> (1) Property acquired by one party before the marriage or acquired in exchange for property acquired prior to the marriage, including any increase in value due to inflation or to a change in market value as a result of conditions outside the control of the parties, but excluding any additional or improvement made by the expenditure of marital funds or as a result of work furnished by either or both of the parties during marriage with the value of such addition or improvement

Justice Brotherton, writing a unanimous opinion, used the source of funds to classify property that appreciated); *Rogers v. Rogers,* 182 W.Va. 388, 387 S.E.2d 855 (1989) (in which Justice Workman, again writing a unanimous opinion, noted the record was deficient to determine the ownership of certain jointly titled real estate and remanded the case for further development to determine if the items were in fact separate or marital property).

The majority's discussion of other jurisdictions is flawed because although most recognize interspousal gifts, these gifts, the same as gifts from third parties, require affirmative proof showing an intention to make a gift, delivery and acceptance. *See Moser v. Moser,* 117 Ariz. 312, 572 P.2d 446 (1977); *Potter v. Potter,* 280 Ark. 38, 655 S.W.2d 382 (1983); *In re Marriage of Weinstein,* 128 Ill.App.3d 234, 83 Ill.Dec. 425, 470 N.E.2d 551 (1984); *Smith v. Smith,* 472 A.2d 943 (Me.1984); *Lowry v. Lowry,* 375 Pa.Super. 382, 544 A.2d 972 (1988). In addition our legislature specifically required affirmative proof of interspousal gifts. *W. Va. Code,* 48–3–10 [1984].

**468**

being in the ratio of the value added and the value of the property immediately before the addition or improvement was made;

(2) Property acquired by one party and excluded by valid agreement of the parties entered into before, during or after the marriage;

(3) Property acquired by one party by gift, bequest, devise or descent, including any increase in value due to inflation or to a change in market value as a result of conditions outside the control of the parties, but excluding any addition or improvement made by the expenditure of marital funds or a result of work furnished by either or both of the parties during marriage with the value of such addition or improvement being in the ration of the value added and the value of the property immediately before the addition or improvement was made, or to the extent that equity is increased by the parties during the marriage; and

(4) Property acquired by one party after the final separation and before the divorce or annulment. [Emphasis added].

The Senate version, quoted above, was roundly rejected in favor of our dual property system, quoted earlier.

The justification offered by the majority for giving a rebuttal presumption in favor of marital property is that without the presumption, spouses who paid for the property with separate funds would, in a divorce, end up with their separate property. (Op. at 421). The result the majority seeks to avoid is the result intended by the legislature—namely that separate property, absent a gift or agreement by the parties, remain with its original owner. Indeed most people would agree that it is a fair and just result that separate property should, absent an affirmatively proven gift, remain with its owner. The majority's justification is without merit and its decision adopts, by fiat, the very position rejected by the legislature.