639 S.E.2d 720

**Edson R. ARNEAULT, Petitioner Below, Appellee,**

v.

**Margaret Beth ARNEAULT, Respondent Below, Appellant.**

No. 32865.

Supreme Court of Appeals of West Virginia.

Submitted: June 7, 2006.

Decided: Oct. 5, 2006.

Dissenting Opinion of Justice Maynard Dec. 4, 2006.

Dissenting Opinion of Justice Starcher Nov. 30, 2006.

Concurring Opinion of Justice Benjamin Dec. 15, 2006.

See also 216 W.Va. 215, 605 S.E.2d 590.

631

Richard Neely, Neely & Hunter, Charleston, for the Appellant, Margaret Beth Arneault.

Mark A. Swartz, Swartz Law Offices, L.C., Charleston, for the Appellant, Margaret Beth Arneault.

Robyn Ruttenberg, Law Offices of Robyn Ruttenberg, Wheeling, for the Appellant, Margaret Beth Arneault.

Ancil Ramey, Steptoe & Johnson, PLLC, Charleston, for the Appellee, Edson R. Arneault.

Thomas R. Goodwin, Susan Wittemeir, Johnny M. Knisely, II, Goodwin & Goodwin, Charleston, for the Appellee, Edson R. Arneault.

Daniel J. Guida, Guida Law Offices, Weirton, for the Appellee, Edson R. Arneault.

Robert P. Fitzsimmons, Fitzsimmons Law Offices, Wheeling, for the Appellee, Edson R. Arneault.

DAVIS, Chief Justice.

This family law case involves issues of equitable distribution and the disposition of marital property.[1] The appellant, Margaret Beth Arneault (hereinafter "Mrs. Arneault"), ex-wife[2] of appellee, Edson R. Arneault (hereinafter "Mr. Arneault") appeals from an order entered April 13, 2005, by the Circuit Court of Hancock County. By that order, the circuit court found that the rulings made by the Family Court of Hancock County were not clearly wrong and that the family court had not abused its discretion. On appeal, Mrs. Arneault argues that the lower courts improperly divided the marital estate with a 35/65 split, that certain stock should have been divided in kind rather than valued at a discount, and that the interest rate on the related payments was improper. Further, Mrs. Arneault argues that oil and gas entities controlled by Mr. Arneault were incorrectly valued for distribution purposes. In response, Mr. Arneault argues that the circuit court's order affirming the family court's decision was proper, with the exception of his cross assignment of error challenging the amount of discount to be applied to the valuation of the aforementioned stock.[3] Based upon the parties' arguments, the record designated for our consideration, and the pertinent authorities, we determine that the circuit court's ratification of the equitable distribution order constituted an abuse of discretion. Thus, we reverse the decision of the circuit court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

A brief synopsis of the relevant facts shows that the parties were married on July 12, 1969, and now have two adult children. The parties had been married for thirty-three years when Mr. Arneault filed for divorce on March 22, 2002. By agreement of

1. On a prior occasion, this Court issued an opinion on a petition for extraordinary writ wherein we awarded Mrs. Arneault $241,034.42 in past attorneys' fees plus *pendente lite* support in the amount of $20,000.00 per month. The previous opinion provides background details that are irrelevant to the present action, but may provide an additional understanding of the case. *See Arneault v. Arneault*, 216 W.Va. 215, 605 S.E.2d 590 (2004) (per curiam). Subsequent to the first opinion in *Arneault*, on March 9, 2005, we granted a rule to show cause in contempt to the Circuit Court of Hancock County with directions to enforce the opinion issued by this Court in the first *Arneault* case. The circuit court entered an enforcement order on April 13, 2005. This case is now before this Court for the third time on issues involving the proper division and valuation of the marital estate.

2. The parties were divorced by order of the family court entered July 22, 2004.

3. Specifically, Mr. Arneault asserts that a thirty percent discount, as opposed to the fifteen percent discount applied by the family court, should have been used in reaching the value of the stock.

the parties, they denominated December 20, 2002, as their date of separation. By order of the family court, the parties were granted a divorce on July 22, 2004. The parties' marital home was located in Grand Rapids, Michigan. During the marriage, Mrs. Arneault stayed home with the children until 1990, when she returned to work on a part-time basis as a teacher. In 1995, Mrs. Arneault started her own business as a counselor providing college placement and career consulting services to high school students. While there is discord as to the effort Mrs. Arneault applied to her business, there is no dispute that Mrs. Arneault's business did not generate great income.

Mr. Arneault currently holds the same job position as he did at the time of the divorce. Mr. Arneault is Chairman, President, and Chief Executive Officer of MTR Gaming Group, Inc. (hereinafter "MTR"), which owns and controls Mountaineer Park, Inc., and operates video lottery terminals. Since 1995, Mr. Arneault has worked in Chester, West Virginia, away from the marital home. Prior to the divorce, he returned to Michigan on most weekends. There is no dispute that Mr. Arneault has been responsible for MTR's great success. In return for his achievements, Mr. Arneault has received a lucrative income from MTR, as well as MTR stock. Mr. Arneault owns 3,308,532 shares of MTR stock in his name; 199,333 shares of stock held by a company that is owned solely by Mr. Arneault; and 300,000 shares held in option.[4] These stock holdings amount to Mr. Arneault owning approximately 13.25% of the total shares of MTR. The MTR stock is publicly-traded on the NASDAQ Stock Market.[5] All parties concede that this stock was acquired during the parties' marriage and is properly the subject of equitable distribution.

In the bifurcated case below, the family court determined that because Mr. Arneault

had contributed significantly to the marital estate, a 50/50 split of the estate would be inequitable. Thus, the family court ordered that the parties' marital estate be divided 35/65, with Mr. Arneault receiving the larger share. Further, the family court determined that the MTR stock should be retained solely by Mr. Arneault, rather than being distributed in kind to Mrs. Arneault, and that Mr. Arneault should pay Mrs. Arneault her proportionate share of the value thereof. To ascertain the MTR stock's value, the family court applied discount principles, which took into consideration the limitations on Mr. Arneault's ability to sell the stock,[6] and directed Mr. Arneault to pay Mrs. Arneault her share of the stock valuation at the discounted rate, over a period of ten years, at a two percent interest rate. Finally, the family court valued Mr. Arneault's oil and gas interests, which included MTR stock as one of the company assets, and again applied discount principles to the MTR stock. Mrs. Arneault appealed these adverse rulings to the circuit court. By order entered April 13, 2005, the circuit court affirmed the family court's decisions. Mrs. Arneault now appeals to this Court.

## II.

### STANDARD OF REVIEW

The standard of review with which we approach this matter has been explained as follows:

"In reviewing a final order entered by a circuit judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

---

4. This option will expire on March 13, 2010.

5. The symbol under which MTR stock is traded on the NASDAQ Stock Market is "MNTG".

6. Pursuant to Rule 144 of the United States Securities and Exchange Commission, Mr. Arneault is deemed to be an "affiliate" of MTR, SEC Reg. § 230.144(a)(1), and the certificates of MTR stock he holds are classified as "restricted securities," SEC Reg. § 230.144(a)(3). As such, any

sales of MTR stock by Mr. Arneault require him, among other restrictions, to have held such stock for a specified period of time before he is permitted to sell it and limit the number of shares he can sell in a single transaction. SEC Reg. §§ 230.144(d, e). Mrs. Arneault, however, should not be subject to these restrictions insofar as she is no longer Mr. Arneault's wife and the temporal limitations appear to have been satisfied. *See generally* SEC Reg. § 230.144(k).

Syl. pt 1, *Staton v. Staton,* 218 W.Va. 201, 624 S.E.2d 548 (2005). *See also* Syl. pt. 2, *Lucas v. Lucas,* 215 W.Va. 1, 592 S.E.2d 646 (2003) (" 'In reviewing challenges to findings made by a family court judge that also were adopted by a circuit court, a three-pronged standard of review is applied. Under these circumstances, a final equitable distribution order is reviewed under an abuse of discretion standard; the underlying factual findings are reviewed under a clearly erroneous standard; and questions of law and statutory interpretations are subject to a *de novo* review.' Syl. Pt. 1, *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995).").

 Finally, because resolution of this matter also requires the application of a statute, we note that "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995). Mindful of these standards, we proceed to consider the parties' arguments.

### III.

### DISCUSSION

On appeal to this Court, Mrs. Arneault assigns error to the circuit court's affirmation of the family court's rulings, and sets forth four assignments of error: (1) the 35/65 split of the marital estate was improper; (2) the MTR stock was improperly discounted and the value improperly split; (3) application of a two percent interest rate for ten years was improperly applied to the amount Mr. Arneault owed Mrs. Arneault for her equitable share of the marital estate; and (4) the interests in the oil and gas company were improperly undervalued.

In response, Mr. Arneault argues (1) that the statute prescribes an equitable split, not an equal one, and because of his tremendous contributions, a 50/50 split would be inequitable; (2) he should keep all MTR stock as

control stock and reimburse Mrs. Arneault for her equitable shares based on the value of the stock taking into account his insider status and the stock's reduced marketability; and (3) because he provided competent testimony regarding the value of the oil and gas interests, and Mrs. Arneault failed to produce any evidence on this point, the court was correct in accepting his valuation. Mr. Arneault argues that the family court's rulings should be accepted with the exception of his cross assignment of error that a thirty percent marketability discount should be applied, as opposed to the fifteen percent discount applied by the family court, to the valuation of the stock.

To resolve the parties' assignments of error, then, we must ascertain the appropriate percentage split to be applied to the equitable distribution of the marital estate, including a determination of the proper distribution of the MTR stock and the appropriate disposition of the oil and gas interests.

### A. Percentage Applied to Division of Marital Estate

First, we will address the issue of the equitable distribution of the marital estate and, more specifically, the appropriate percentage split to be applied to the estate. Mrs. Arneault argues that a 50/50 split of the marital estate is appropriate, and that Mr. Arneault has not overcome the presumption of an equal division of the marital property. Conversely, Mr. Arneault avers that his contribution to the marital estate has been so substantial that it would be inequitable to require him to divide the marital estate equally. The family court accepted Mr. Arneault's argument and found that it was unjust to divide equally the vast accumulation of wealth of the marital estate. Therefore, the family court split the marital estate 35/65, and the circuit court affirmed.

 In a divorce proceeding, subject to some limitations, all property is considered marital property,[7] which preference is reflected in our case law.

7. W. Va.Code § 48–1–233 (2001) (Repl.Vol.2004) provides as follows:

"Marital property" means:

(1) All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership such as joint tenancy or tenancy in common, joint tenancy with the right of survivorship, or any other form of

"W. Va.Code, 48–2–1(e)(1) (1986) [W. Va. Code § 48–1–233 (2001) (Repl.Vol.2004) ], defining all property acquired during the marriage as marital property except for certain limited categories of property which are considered separate or nonmarital, expresses a marked preference for characterizing the property of the parties to a divorce action as marital property." Syl. pt. 3, *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990).

Syl. pt. 2, *Staton v. Staton*, 218 W.Va. 201, 624 S.E.2d 548. The parties do not contest the lower courts' classification of the estate as marital or separate; thus, we now address the appropriate percentage of the property to be afforded to each party.

 With a few exceptions, all of the parties' property constituted marital property and should have been divided equally absent some compelling reason otherwise. Guidance is provided by the mandate that "[e]xcept as otherwise provided in this section, upon *every* judgment of annulment, divorce or separation, the court shall divide the marital property of the parties equally between the parties." W. Va.Code § 48–7–101 (2001) (Repl.Vol.2004). Where the language of a statute is clear and unambiguous, it must be strictly applied. *See* Syl. pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."). Here, W. Va.Code § 48–7–101 plainly states that, subject to certain limitations, upon the entry of an order of divorce, "the court *shall* divide the marital property of the parties equally." (Emphasis added). " ' "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part

of the Legislature, should be afforded a mandatory connotation." Syllabus Point 1, *Nelson v. West Virginia Public Employees Insurance Board*, 171 W.Va. 445, 300 S.E.2d 86 (1982).' Syllabus point 1, *E.H. v. Matin*, 201 W.Va. 463, 498 S.E.2d 35 (1997)." Syl. pt. 4, *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005). Thus, we must presume that the parties' marital estate will be divided equally, subject to the limitations and considerations set forth in W. Va.Code § 48–7–103 (2001) (Repl.Vol.2004), which provides as follows:

In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:

(1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:

(A) Employment income and other earnings; and

(B) Funds which are separate property.

(2) The extent to which each party has contributed to the acquisition, preservation and maintenance or increase in value of marital property by monetary contributions, including, but not limited to:

(A) Homemaker services;

(B) Child care services;

(C) Labor performed without compensation, or for less than adequate compensation, in a family business or other business

shared ownership recognized in other jurisdictions without this state, except that marital property does not include separate property as defined in section 1-238 [§ 48-1-238]; and

(2) The amount of any increase in value in the separate property of either of the parties to a marriage, which increase results from: (A) an expenditure of funds which are marital property, including an expenditure of such funds which reduces indebtedness against separate property, extinguishes liens, or otherwise increases the net value of separate property; or (B) work performed by either or both of the parties during the marriage.

The definition of "marital property" contained in this section has no application outside of the provisions of this article, and the common law as to the ownership of the respective property and earnings of a husband and wife, as altered by the provisions of article 29 [§§ 48-29-101 et seq.] of this chapter and other provisions of this code, are not abrogated by implication or otherwise, except as expressly provided for by the provisions of this article as such provisions are applied in actions brought under this article or for the enforcement of rights under this article.

entity in which one or both of the parties has an interest;

(D) Labor performed in the actual maintenance or improvement of tangible marital property; and

(E) Labor performed in the management or investment of assets which are marital property.

(3) The extent to which each party expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, including, but not limited to:

(A) Direct or indirect contributions by either party to the education or training of the other party which has increased the income-earning ability of such other party; and

(B) Foregoing by either party of employment or other income-earning activity through an understanding of the parties or at the insistence of the other party.

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property.

 When the issue of the equitable distribution of the marital estate was presented to the family court judge, the family court concluded in its order entered February 20, 2004, that "[t]he presumption of equal division has been rebutted as follows: 65% shall be awarded to the petitioner [Mr. Arneault] and 35% shall be awarded to the respondent [Mrs. Arneault]." The judge explained the rationale for the unequal distribution by finding that, under the factors set forth in W. Va.Code § 48–7–103, Mr. Arneault's contributions to the marital estate overwhelmed the contributions made by Mrs. Arneault. Specifically, the family court reasoned as follows:

Having considered the factors enumerated in West Virginia Code § 48–7–103 as above-described, this Court finds that the presumption of equal division has been rebutted. The petitioner's own overwhelming contribution as defined by § 103(2)(E) and § 103(1)(A) make it completely inequitable to divide the marital estate equally. Equity mandates that the petitioner be awarded a greater percentage of the marital estate. Were subsections 103(2)(E) and (1)(A) the only factors to be considered, the petitioner would be receiving virtually all of the marital estate. However, as [Mrs. Arneault's expert] testified, the respondent engaged in service contributions which gave the petitioner the freedom to focus on his business pursuits. Those contributions and the other factors in § 103 create the respondent's entitlement to a portion of the estate. This Court believes her contributions were substantial, but not as overwhelming as the petitioner's contributions. Thus it is equitable that her share of the estate be less, although still substantial, because of her service contributions, and this Court finds equity to require that she receive thirty-five percent (35%) of the marital estate. It is proper that the petitioner must receive an adequate award for his accomplishments, and, at the same time, the respondent be properly rewarded for her contributions to the environment which permitted him to use his personal talents to amass this fortune.

In that same order, the family court further explained that

[t]he petitioner's intelligence and ability are unique to him and the development of these attributes can not [sic] be attributed equally to the petitioner and respondent, regardless of the environment which the respondent created in order to allow the petitioner to achieve the estate that has been amassed. He must be given some additional weight and credit in equitable distribution for existence of those attributes, intelligence, and abilities, which helped him achieve the marital estate currently in question. This Court looks at these personal attributes as substantial service contributions to the marital estate. There are many persons who have obtained an MBA and become a CPA during their marriage, but they have not accom-

plished nearly the achievements of the petitioner. These achievements go beyond the acquisition of degrees or experience, and must be given additional consideration in equitable distribution.

In essence, it appears that the family court judge believed Mr. Arneault's intelligence and ability led to his great financial success, and while Mrs. Arneault's homemaking and child-rearing duties were substantial, they did not compare to Mr. Arneault's contribution to the marital estate. To reach this conclusion, the family court apparently found that Mr. Arneault's personal goodwill was sufficient to overcome the presumption of an equal division of the marital estate. We do not agree.

■ The value of "'[p]ersonal goodwill' ... [is] a personal asset that depends on the continued presence of a particular individual and may be attributed to the individual owner's personal skill, training or reputation." Syl. pt. 3, *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003). While we agree that Mr. Arneault may possess substantial personal goodwill, it is not an appropriate consideration in comparing the contributions of Mr. and Mrs. Arneault to the marriage. Rather, Mr. Arneault's personal goodwill would be relevant if we were asked to value MTR, the company for which Mr. Arneault worked during the parties' marriage and by whom he continues to be employed, and to determine its net value for division. However, that is not the case before us. This is not a situation of personal goodwill and its worth to a company, but rather of Mr. Arneault's knowledge and skill acquired during the course of the marriage and its worth to the value of the marriage as compared to the services and income contributed by Mrs. Arneault.

■ Significantly, we disagree with the family court's undervaluement of the contributions made to the marital estate by Mrs. Arneault. In essence, the family court found that because Mrs. Arneault's contributions were not monetary in nature, they did not count as substantially as Mr. Arneault's contributions to the marital estate. This idea is contrary to West Virginia jurisprudence. We previously have held:

Under equitable distribution, the contributions of time and effort to the married life of the couple-at home and in the workplace-are valued equally regardless of whether the parties' respective earnings have been equal. Equitable distribution contemplates that parties make their respective contributions to the married life of the parties in that expectation.

Syl. pt. 7, *Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382 (1996), *overruled on other grounds by* Syl. pt. 3, *Mayhew v. Mayhew*, 205 W.Va. 490, 519 S.E.2d 188 (1999). We likewise have stated that "general contributions, rather than economic contributions [a]re to be the basis for a distribution" of a marital estate. *Raley v. Raley*, 190 W.Va. 197, 199–200, 437 S.E.2d 770, 772–73 (1993) (per curiam). In *Raley* we recognized that the wife "made a significant monetary contribution to the marriage as well as many other contributions, *i.e.,* homemaker skills, in which she did not receive any sort of financial compensation." *Id.,* 190 W.Va. at 200, 437 S.E.2d at 773. Thus, based on the value of her homemaker services, we determined that the wife was entitled to fifty percent of the investment account that was at issue before the Court. *Id.*

The facts of the present case highlight how important the contributions of both parties were to the marital estate. It was conceded that Mr. Arneault and Mrs. Arneault did not have any unusual fortune at the time of their marriage. Mrs. Arneault had recently received an undergraduate degree, and Mr. Arneault earned his undergraduate degree soon after they married. Mrs. Arneault then earned a masters degree, while Mr. Arneault went on to obtain his CPA license and a masters degree in business administration. The family court found that Mr. Arneault's innate abilities led to the financial wealth of the marital estate. However, the facts illustrate that the opposite is more probable. Mr. Arneault and Mrs. Arneault entered the marriage on fairly equal levels. Mr. Arneault earned a professional license and a graduate degree after the marriage commenced. It is very conceivable that this accumulation of knowledge, after the commencement of the marriage, led to the development of Mr. Arneault's innate abilities.

Even though Mrs. Arneault also had an advanced degree, she abandoned her own career in order to stay home with the couple's children. She also was responsible for the majority of the housework and the maintenance of the marital residence. Her responsibilities were manifestly increased by the fact that Mr. Arneault was completely absent from the marital home during the work week, leaving Mrs. Arneault with even greater responsibilities and household duties than is normally encountered in like circumstances. Rather than the conclusion made by the family court, the facts of this case show it is more likely that Mrs. Arneault's contributions to the marriage are precisely the reason that Mr. Arneault was able to succeed in his work.

While this Court has recognized that there are circumstances in which an unequal distribution of a marital estate is appropriate, this is not one of those cases. *See, e.g., Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995) (finding that an unequal distribution of marital property can sometimes be appropriate; however, remanding the case after concluding that the family law master and the circuit court failed to make sufficient findings to justify the conclusion that payment of the mortgage on the home in question was marital property within the meaning of our equitable distribution law); *Somerville v. Somerville*, 179 W.Va. 386, 369 S.E.2d 459 (1988) (recognizing that an unequal distribution is appropriate under certain circumstances, but finding that under the facts of that case, the trial court abused its discretion by awarding less than fifty percent of the marital property without articulating a reason for the unequal division as required by the applicable statutory law); *Cross v. Cross*, 178 W.Va. 563, 363 S.E.2d 449 (1987) (recognizing importance of general contributions, rather than economic contributions, as the basis for equitable distribution principles). *But cf. Raley v. Raley*, 190 W.Va. 197, 437 S.E.2d 770 (holding homemaker wife was entitled to half of the valuation of the parties' stock investments based on her general, rather than economic, contributions to the marital estate).

In the present case, there is no allegation that Mrs. Arneault did anything to detract from the value of the marital estate, and no suggestion that she did anything to frivolously dispose of marital money or assets. Thus, we conclude that the family court abused its discretion in fixing a 35/65 split of the marital estate. Mr. Arneault's intelligence and financial prowess is not sufficient justification for straying from the presumption of a 50/50 split. This conclusion is especially true under facts such as these where it is clear that Mr. Arneault's success was due in large part to the contributions made to the marriage by Mrs. Arneault. Accordingly, we find that the marital estate should be split 50/50 and reverse the circuit court's contrary ruling.

### B. MTR Stock

■ We next must determine whether the MTR stock acquired by Mr. Arneault during the parties' marriage was properly disbursed by the family court's order, which disposition was upheld by the circuit court. By order entered February 20, 2004, the family court determined that all of the MTR stock acquired by Mr. Arneault during the parties' marriage constituted marital property:

> There is no evidence in the record suggesting that any asset(s)[,] option(s), or right(s) acquired during the marriage or any earnings, again during the marriage, of either party to this action are not marital property. The MTR Gaming Stock and options exercised and unexercised which were granted preseparation are marital property.

In total, Mr. Arneault acquired some 3,308,-532 [8] shares of MTR stock during the parties' marriage by way of MTR's payment of some of his employment wages and benefits to him in stock in lieu of cash and through the exercise of various options [9] he also received as compensation. During its equitable distribution of the parties' marital estate, the family court determined that these shares of MTR stock, which constitute the largest asset of the estate, should be retained by Mr.

---

8. Mr. Arneault holds an additional 300,000 shares of MTR stock in option, and the oil and gas company, which he owns, holds 199,333 shares of MTR.

9. To exercise these options, Mr. Arneault has incurred indebtedness of approximately $8.5 million, for which the stock acquired with such funds has been pledged as collateral.

Arneault, rather than Mrs. Arneault's portion thereof being distributed to her in kind,[10] and that, as a result, Mr. Arneault should pay Mrs. Arneault for the value of her portion of said stock. In determining the amount of this monetary payment, the family court concluded that because Mr. Arneault was required to abide by certain restrictions in his sale of and other dealings with this stock,[11] the stock's value should be discounted to account for such limitations. Specifically, the family court ordered, on July 22, 2004, that

> if [Mrs. Arneault] is to receive an equitable payment for her interests in the MTR stock, then [Mr. Arneault] must be obligated to pay [her] the value of the stock as if she had received her proportionate share of said stock outright, including the devaluation that would definitely be suffered by said transfer.

Accordingly, by order entered January 27, 2005, the family court applied a fifteen percent discount to the customary market value of the stock, for an approximate total of $4,216,334.79 due to Mrs. Arneault.[12] The family court further permitted Mr. Arneault to pay this amount to Mrs. Arneault over a period of ten years with two percent interest being applied thereto, determining a two percent rate, which represented "the going rate" available from lending institutions, was more equitable than a ten percent "judgment rate".

On appeal to this Court, Mrs. Arneault assigns error to the lower courts' rulings and argues that her equitable distribution portion of the stock acquired during the parties' marriage should be distributed to her in kind. By contrast, Mr. Arneault objects to an in-kind distribution of Mrs. Arneault's portion of the MTR stock and suggests that the lower courts' award to her of a cash payment of the value thereof is more appropriate in light of his status as an officer and employee

of MTR and the stock's impaired marketability as a result of these relationships.[13]

The parties do not dispute that Mrs. Arneault is entitled to a portion of the MTR stock acquired by Mr. Arneault during the parties' marriage. What is disputed, however, is how much stock Mrs. Arneault should receive and in what form, i.e., in kind or the cash value thereof. In the preceding section, we concluded that Mrs. Arneault should receive fifty percent of the parties' marital assets, including the MTR stock. To determine the form in which Mrs. Arneault's portion of the MTR stock should be distributed to her, though, we must refer to the applicable statutory provision, W. Va.Code § 48–7–105 (2001) (Repl.Vol.2004), which directs, in relevant part,

> [i]n order to achieve the equitable distribution of marital property, the court shall, unless the parties otherwise agree, order, when necessary, the transfer of legal title to any property of the parties, giving preference to effecting equitable distribution through periodic or lump sum payments . . . . In any case involving the equitable distribution of . . . ownership interests in a business entity, the court shall, unless the parties otherwise agree, give preference to the retention of the ownership interests in such property. In the case of such business interests, the court shall give preference to the party having the closer involvement, larger ownership interest or greater dependency upon the business entity for income or other resources required to meet responsibilities imposed under this article, and shall also consider the effects of transfer or retention in terms of which alternative will best serve to preserve the value of the business entity or protect the business entity from undue hardship or from interference caused by one of the

---

**10.** The phrase "in kind" means "[i]n goods or services rather than money." Black's Law Dictionary 802 (8th ed.2004). In this case, we use the term "in kind" to refer to the distribution of the actual stock, itself, as opposed to a monetary payout representing the stock's value.

**11.** See supra note 6.

**12.** This calculation is based upon the family court's valuation of the stock at a fifteen percent

discount, which was then applied to thirty-five percent of the marital estate's MTR stock holdings. This thirty-five percent figure corresponds with the equitable distribution to which the family court found Mrs. Arneault to be entitled and which we have determined to have been erroneous. See Section III.A., supra.

**13.** See note 6, supra.

parties or by the divorce, annulment or decree of separate maintenance: Provided, however, That the court may, unless the parties otherwise agree, sever the business relationship of the parties and order the transfer of legal title to ownership interests in the business entity from one party to the other, without regard to the limitations on the transfer of title to such property otherwise provided in this subsection, if such transfer is required to achieve the other purposes of this article: Provided further, That in all such cases the court shall order, or the agreement of the parties shall provide for, equitable payment or transfer of legal title to other property, of fair value in money or moneys' worth, in lieu of any ownership interests in a business entity which are ordered to be transferred under this subsection....

Before this statute may be applied to the facts presented by the case *sub judice*, we must first ascertain its meaning.

■■■■ The first step in a statutory analysis is to identify the intent expressed by the Legislature in promulgating the provision at issue. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). Next, we look to the specific language employed by the Legislature. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968). *Accord* Syl. pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W.Va. 137, 107 S.E.2d 353 (1959) ("When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."); Syl. pt. 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and

plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect."). Finally, although a statutory provision may be plainly written, it may nevertheless contain an undefined word. Under such circumstances, "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners in Gen. Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982).

■■■ The statute governing the instant appeal, W. Va.Code § 48–7–105, clearly expresses a legislative intent to "achieve the equitable distribution of marital property" and provides detailed instructions for reviewing courts when such marital property is comprised of "ownership interests in a business entity," *id.* Insofar as certificates of stock, such as the MTR stock at issue in this case, constitute "ownership interests in a business entity," [14] the directives of this statute provide guidance as to the form in which Mrs. Arneault should receive her equitable portion of fifty percent of the parties' MTR stock holdings. Succinctly stated, the remaining language of W. Va.Code § 48–7–105 is plain. Accordingly, we hold that W. Va. Code § 48–7–105 (2001) (Repl.Vol.2004) instructs a court how to equitably distribute a martial estate's ownership interests in a business entity and directs the court to (1) "give [a conditional] preference to the retention of the ownership interests"; (2) consider the party who has the "closer involvement" with, "larger ownership interest" in, or "greater dependency" on such business; (3) further consider "the effects" that a "transfer or retention" of such ownership interests would have on the business, itself; and (4) secure the rights of the parties to receive that to which they are equitably entitled under this

14. "Stock" is defined as "the proprietorship element in a corporation usu. divided into shares and represented by transferable certificates." Webster's Ninth New Collegiate Dictionary 1159 (1983). *Accord* Black's Law Dictionary, at 1456 (defining "stock" as "[a] proportional part of a corporation's capital represented by the number of equal units (or shares) owned, and granting the holder the right to participate in the company's general management and to share in its net profits or earnings").

provision, either through an in kind transfer of the ownership interests or by the transfer of money or other property of equivalent value. *Id.* We will proceed to consider each of these factors in light of the facts presently before us.

**1. Conditional preference for the retention of the ownership interests.** The first step a court must take when determining the proper distribution of business ownership interests is to accord preference to the retention of the ownership interests "unless the parties otherwise agree." W. Va.Code § 48–7–105. This preference is also tempered by the statute's recognition that a transfer of ownership interests from one party to the other may be warranted "if such transfer is required to achieve the other purposes of this article." *Id.*

Applying this factor to the case *sub judice,* we find that while Mr. Arneault is the party who initially acquired the MTR stock, either as compensation for services he performed for MTR or by purchasing such shares, all MTR stock acquired during the parties' marriage previously has been determined to be marital property. Thus, given that both of the parties herein, *i.e.,* Mr. *and* Mrs. Arneault, own the MTR stock as marital property, retention by each of them of their one-half portions of such holdings is the preferred equitable distribution of this marital asset. The conditions which may rebut this preference do not do so in this case: the parties have not "otherwise agree[d]" to a different disposition of the MTR stock, and a transfer of the ownership interests from one party to the other would not achieve the stated legislative purpose of equitably distributing the marital property. *Id.* Rather, as will be explained further in the remaining steps of this statutory analysis, the circumstances of this case necessitate that each party receive fifty percent of the MTR stock in kind.

**2. Consideration of parties' relationship to the business.** The next factor to consider is the relationship of the parties to the business whose ownership interests are at issue. Under the statute, "the court shall give preference to the party having the closer involvement, larger ownership interest or greater dependency upon the business entity for income or other resources required to meet responsibilities imposed under this article." W. Va.Code § 48–7–105. Without question, Mr. Arneault has a greater affiliation[15] with MTR than does Mrs. Arneault since he is an actual officer and employee of this company, and, other than being Mr. Arneault's former spouse,[16] Mrs. Arneault has no connection with MTR whatsoever. Under the second criterion giving preference to the party with the "larger ownership interest" in the business, neither party is preferred here insofar as they both have an equal ownership interest in the MTR stock which has been classified as marital property. Finally, with respect to the remaining relationship to consider in this step, Mr. Arneault has a greater dependency on the business as a source of income to meet any of his obligations that should arise from the parties' divorce given that MTR is his employer. As we will explain in greater detail below, though, Mr. Arneault's closer involvement with and dependency on the business as his source of income do not automatically entitle him to retain all of the marital estate's MTR stock holdings.

**3. Consideration of the effects of the retention or transfer of the ownership interests.** The third factor to consider regarding the distribution of ownership interests in a business entity pursuant to W. Va.Code § 48–7–105 regards the effect that the transfer or retention of the ownership interests would have on the business entity itself, with a preference being accorded to the alternative that would best "preserve the value of the business entity or protect [it] from undue hardship or from interference caused by one of the parties." In this case, Mr. Arneault

---

**15.** On this point, the parties advance several arguments as to whether MTR is a closely held or publicly held corporation and suggest that that denomination is determinative of the statute's "closer involvement" inquiry. *See* W. Va.Code § 48–7–105. We do not read the statute as requiring such a distinction to be made, but rather as simply asking the reviewing court to look at the relationship of both parties to the business in question and to determine as between them who has, or has had, a greater affiliation with or connection to that entity.

**16.** *See supra* note 2.

strongly argues that he should be allowed to retain one hundred percent of the parties' MTR stock in order to safeguard its value and to protect MTR. Specifically, Mr. Arneault expresses concern that as a result of the peculiarities of this particular case, should Mrs. Arneault be awarded fifty percent of the parties' MTR stock, she would be holding more than five percent of the stock of a gaming entity[17] without a license in violation of W. Va.Code § 29–22A–8(*l*) (1998) (Repl.Vol.2004),[18] which transaction would, in turn, void Mr. Arneault's license, and, further, that she would sustain impaired marketability of the stock should she try to sell it as a result of Mr. Arneault's close affiliation with MTR.[19] We are not persuaded by either of these arguments.

First, Mrs. Arneault can easily overcome the prohibitions of W. Va.Code § 29–22A–8(*l*) either by applying for a license to permit her to hold the 6.625% of MTR stock to which she is equitably entitled pursuant to W. Va.Code § 29–22A–7 (2000) (Repl.Vol. 2004) and/or by requesting permission from the West Virginia lottery commission to acquire such stock as provided for by the terms of § 29–22A–8(*l*). Additionally, she could sell a portion of her stock so that her holdings would be within the parameters allowed by W. Va.Code § 29–22A–8(*l*). Second, the various regulations restricting Mr. Arneault's treatment and handling of his portion of the MTR stock should not affect Mrs. Arneault's shares of the MTR stock because the parties are no longer legally married and the temporal restrictions have been satisfied.[20] Mr.

Arneault also has failed to appreciate that it is in Mrs. Arneault's best interests to refrain from flooding the market by selling an exorbitant number of her MTR shares because any depreciation in the market price of the stock resulting from such a rapid sale would correspondingly reduce Mrs. Arneault's earnings therefrom.

Finally, a 50/50 distribution of the MTR stock to each of the parties in this case would not jeopardize the value of the business entity, MTR. MTR is a public corporation,[21] publicly traded on the NASDAQ Stock Market, and is not closely held.[22] Although the MTR stock shares declared to be marital property constitute 13.25% of MTR's total stock offerings, and Mr. Arneault as the owner[23] of such stock is the company's majority stockholder, this proportion of the stock does not approach that number of shares necessary to constitute a majority of the company's total 27,498,000 outstanding shares. Finding no detriment to MTR should Mrs. Arneault receive her portion of the parties' MTR stock in kind, we proceed to consider the remaining statutory factor.

**4. Achievement of equitable distribution of ownership interests, either through in kind transfer of ownership interests or through transfer of money or other property of equivalent value.** The final factor to consider regarding the equitable distribution of ownership interests in a business entity is whether equitable distribution may be accomplished by awarding to one party other property or money of equivalent value in lieu

---

**17.** The MTR stock at issue in this case represents approximately 13.25% of the ownership of MTR.

**18.** Specifically, W. Va.Code § 29–22A–8(*l*) (1998) (Repl.Vol.2004) prohibits

The sale of more than five percent of a license or permit holder's voting stock, or more than five percent of the voting stock of a corporation which controls the license or permit holder or the sale of a license or permit holder's assets, other than those bought and sold in the ordinary course of business, or any interest therein, to any person not already determined to have met the qualifications of section seven [§ 29–22A–7] of this article voids the license unless the sale has been approved in advance by the commission.

**19.** *See supra* note 6.

**20.** *See supra* notes 2 & 6.

**21.** A "public corporation" is "[a] corporation whose shares are traded to and among the general public[.]" Black's Law Dictionary, at 367. By contrast, a "close corporation" is "[a] corporation whose stock is not freely traded and is held by only a few shareholders (often within the same family)." *Id.*, at 365.

**22.** *Id.*

**23.** The word "owner" is used here only to explain that the stock was given to or purchased by Mr. Arneault, instead of by some other third party, and should not be construed as deviating from our affirmance of the lower courts' classification of the Arneaults' MTR stock holdings as marital property owned jointly by Mr. *and* Mrs. Arneault.

of an in kind transfer of the subject ownership interests. Aside from the fact that the preceding statutory factors favor distributing the MTR stock to the parties in kind, such a disposition is also proper under this factor because there is no alternative property or money of equivalent value that could be given or allocated to one of the parties in lieu of their one-half portion of the MTR stock holdings. In this case, the single largest marital asset is the MTR stock. Although the lower court permitted Mr. Arneault to retain one hundred percent of the parties' MTR stock holdings and to pay Mrs. Arneault the cash value thereof, we do not find this arrangement to be an "equitable distribution" of the parties' marital estate.

▇▇▇ Because the marital estate does not have any other asset that even approaches the value of the MTR stock, much less is comparable thereto, there is no other property or money of equivalent value that could be awarded to Mrs. Arneault in lieu of the fifty percent of the MTR stock to which she is entitled. Moreover, Mr. Arneault incurred substantial debt in order to purchase certain of the shares of MTR stock at issue herein.[24] Just as it would be inequitable to deprive Mrs. Arneault of the certain receipt of the value of the MTR stock she is entitled to receive, it likewise would be unfair to entirely absolve Mrs. Arneault of the debt involved in the acquisition of her portion of such stock. Accordingly, we reverse the circuit court's order that permitted Mr. Arneault to pay Mrs. Arneault a discounted value for her portion of the MTR stock over a period of time and award Mrs. Arneault one-half of the parties' MTR stock in kind.[25] Additionally, Mrs. Arneault is charged with one-half of the debt[26] attributable to the acquisition of the parties' MTR stock.[27]

### C. Oil and Gas Interests

▇▇▇ The final issue of contention presented for our resolution involves the disposition of several interrelated oil and gas companies, which Mr. Arneault solely or partially owns. One of these companies, Century Energy Management Co. (hereinafter "CEMCO"), which is owned solely by Mr. Arneault, holds approximately 199,333 shares of MTR stock.[28] These shares were pledged as collateral for a loan from Huntington National Bank, which has a balance of approximately $845,090.00. There is no dispute that this conglomeration of companies is closely held and, to protect the ownership status, that Mr. Arneault should be awarded the corporations and Mrs. Arneault should receive her equitable share of the value thereof.

With respect to Mrs. Arneault's equitable portion of these interests, the parties conceded that Mr. Arneault owned only fifty percent of CEMCO at the time of the parties' separation. Thus, Mrs. Arneault is entitled only to fifty percent of Mr. Arneault's fifty percent share, which amounts to twenty-five percent of the oil and gas interests. In addition to her entitlement to twenty-five percent of the corporate ownership, Mrs. Arneault is correspondingly responsible for twenty-five percent of CEMCO's debts and liabilities.

The primary source of contention on this point concerns the proper valuation of these oil and gas interests. It is generally recognized that the valuation of a closely-held corporation is more difficult to determine because such stock is not publicly traded.

---

24. *See* note 9, *supra.*

25. This result is consistent with our resolution of similar cases in which the assets of a marital estate included a substantial amount of stock holdings. *See, e.g., Boyle v. Boyle,* 190 W.Va. 655, 660, 441 S.E.2d 376, 381 (1994) (recognizing that "[t]he actual distribution should be of the stock itself"); *Kapfer v. Kapfer,* 187 W.Va. 396, 419 S.E.2d 464 (1992) (per curiam) (same).

26. Similarly, Mrs. Arneault is responsible for any tax consequences that may arise from her receipt or sale of such stock. *See generally Kapfer v. Kapfer,* 187 W.Va. 396, 419 S.E.2d 464.

27. Because we have determined that the marital estate should be equitably distributed 50/50 and that the MTR stock should be distributed in kind, we do not need to address the parties' remaining arguments regarding the proper valuation of the stock or the interest rate applicable thereto. Our resolution of this case also obviates the need to address Mr. Arneault's cross assignment of error.

28. These 199,333 shares of MTR stock are registered in the name of CEMCO.

*See Tankersley v. Tankersley,* 182 W.Va. 627, 630, 390 S.E.2d 826, 829 (1990). During the underlying proceedings, the parties presented testimony regarding the proper valuation of the interests, which included assessments for the companies' real estate, personal property, other assets, and liabilities. The family court accepted Mr. Arneault's valuation of the oil and gas interests at *negative* $1,628,891.00, rejecting Mrs. Arneault's valuation of the interests at *positive* $571,292.80. Also disputed by the parties is the proper valuation of the 199,333 shares of MTR stock owned by CEMCO as its asset and providing security for its loan. Taking into account all of CEMCO's assets and liabilities, including its MTR stock and the accompanying loan, we find that Mrs. Arneault's entitlement to twenty-five percent of CEMCO's assets coupled with her responsibility for twenty-five percent of its liabilities cancel each other, resulting in a net value of zero. Therefore, Mr. Arneault retains full ownership interests in the oil and gas properties, Mrs. Arneault is entitled to no payout for her share of such interests, and Mrs. Arneault is not responsible for any of CEMCO's debts or liabilities associated therewith. Accordingly, the decision of the circuit court reaching the opposite conclusion is reversed.

## IV.

### CONCLUSION

In summary, we find that the circuit court abused its discretion in affirming the family court's final equitable distribution of the marital estate. *See* Syl. pt. 1, *Staton v. Staton,* 218 W.Va. 201, 624 S.E.2d 548. First, the proper equitable distribution of the marital estate is the statutorily presumed fifty percent distribution to each party. *See* W. Va. Code § 48–7–101. Additionally, the proper distribution of the MTR stock is a disbursement of the stock in kind. Finally, given the limited assets and substantial liabilities of the oil and gas interests, as well as their closely-held character, the entirety of the ownership interests therein and associated debts thereof are awarded to Mr. Arneault. Accordingly, the decision of the circuit court affirming the contrary decisions of the family court is reversed.

Reversed.

MAYNARD, Justice, dissenting.

(Filed Dec. 4, 2006)

I dissent to the majority decision in this case because I do not believe that the family court erred by splitting the marital estate 35/65 with Mr. Arneault receiving the larger share. Furthermore, I do not believe that in-kind distribution of Ms. Arneault's portion of the MTR stock as ordered by the majority is appropriate. I would have affirmed the decision of the family court which allowed Mr. Arneault to retain all the MTR stock but ordered him to pay Ms. Arneault for her share of the stock over a period of ten years at a two percent interest rate.

With regard to the division of the marital estate, I agree with the family court's conclusion that the contributions to the marriage made by Mr. Arneault make it completely inequitable to order equal distribution. The evidence presented in this case showed that the Arneaults lived and worked in separate states for more than a decade. After Mr. Arneault took over as President and CEO of MTR Gaming, he began spending most of his time in West Virginia although he returned to Michigan a few days a week to participate in various activities with his children. It is undisputed that much of MTR's success is a result of Mr. Arneault's considerable efforts. More importantly, it is undisputed that the financial success and wealth of the Arneaults is solely the result of Mr. Arneault's employment. While Ms. Arneault started her own business to provide consulting services to high school students applying to college, her efforts did not result in much income.

The majority opinion finds that a 50/50 split of the marital estate is warranted in this case because Ms. Arneault equally contributed to the marriage by raising the parties' children and maintaining the family household. The majority states that Ms. Arneault's responsibilities "were manifestly increased by the fact that Mr. Arneault was completely absent from the marital home during the work week[.]" Maj. op. at 729. However, the record does not support these conclusions. While it is true that Mr. Arneault was absent from the marital home for considerable periods of time because of his employment, Ms. Arneault conceded that he

was an involved father who returned home almost every weekend and made time to coach his son's athletic teams. Moreover, Mr. Arneault's financial success allowed Ms. Arneault to have a comfortable lifestyle even in his absence as third-parties provided many housekeeping and childcare services.

There is also simply no evidence to support Ms. Arneault's assertion that she provided substantial assistance to Mr. Arneault's success with MTR. She was not a host for her husband's business functions nor did she have anything to do with MTR. In fact, the record indicates that Ms. Arneault rarely traveled to West Virginia. Ms. Arneault was simply not a "corporate spouse" who made substantial sacrifices to ensure the success of her husband's business. Therefore, I believe it is inequitable for her to receive 50 percent of the MTR stock at issue.

After finding that the marital estate should be equally divided, the majority opinion goes on to find that Ms. Arneault's portion of the stock should be distributed to her in-kind. In doing so, the majority fails to comply with the provision of W.Va.Code § 48–7–105 requiring courts to consider the effect on the business entity when stock is divided. Specifically, the statute provides that courts "shall also consider the effects of transfer or retention in terms of which alternative will best serve to preserve the value of the business entity or protect the business entity from undue hardship or from interference caused by one of the parties or by the divorce[.]" W.Va.Code § 48–7–105. By awarding Ms. Arneault in-kind distribution, the majority has unnecessarily put MTR at risk. In particular, the majority's decision effectively reduces Mr. Arneault's interest in MTR by half. Because Mr. Arneault is President and CEO of MTR, such a significant reduction in his holdings could cause the value of the stock to fall precipitously and weaken the corporation as a business entity. Furthermore, there is nothing to prevent Ms. Arneault from cumulatively voting her stock and putting her divorce attorney on the board of MTR which would clearly be devastating to the company.

The record in this case reflects that Mr. Arneault has been a critical factor in developing MTR into a very successful business and providing many jobs to the citizens of this State. As President and CEO, Mr. Arneault is the public face of MTR. Should the market lose confidence in the stability of MTR's management, the result could be a disaster for MTR and its innocent employees who depend upon the company for their livelihood. By improperly interfering in MTR's corporate affairs, the majority may have placed the jobs of MTR employees and the investments of many individual stockholders in jeopardy. Accordingly, I respectfully dissent from the majority's decision in this case.

STARCHER, J., dissenting.

(Filed Nov. 30, 2006)

In the instant case, there is more than sufficient evidence of record to support the family court's decision, under the clear law of this State. The majority opinion flies in the face of the scheme set forth by our legislature for dividing marital assets. Apparently the majority thinks West Virginia should be a community property state, and it may take further legislative action to correct their misapprehension.

This marriage was *not* a standard fifty/fifty marital partnership, where Mrs. Arneault was the homemaker/support mechanism and Mr. Arneault was the income earner outside the home. Although the couple lived together prior to Mr. Arneault's success (which has resulted in this dispute over the MTR Gaming stock), the Arneaults have lived and worked in separate states for more than a decade.

Since 1995, Mrs. Arneault lived in Michigan and Mr. Arneault spent the bulk of his time in West Virginia. He returned to Michigan a few days a week, being actively involved in various activities with his children, including coaching his son's teams in various sports, such as football, wrestling, basketball, and baseball, and performing household duties, while Mrs. Arneault engaged in her counseling business. Mrs. Arneault only visited West Virginia perhaps three times in ten years. The couple's children are now both emancipated adults and Mrs. Arneault, who received her masters' degree in 1971, works in her consulting business, which she has maintained on a full-time basis since 1995. There was no evidence that Mrs. Arneault's

choices regarding work were compelled by Mr. Arneault or the couple's circumstances. Rather, since 1995, the couple pursued separate lives in separate states.

There is no evidence to support Mrs. Arneault's assertions that she provided substantial assistance in Mr. Arneault's success with MTR Gaming. For example, there is no evidence of record that Mrs. Arneault was a host for her husband's business functions. When Mr. Arneault accumulated the stock which is the subject of this appeal, Mrs. Arneault lived in Michigan and Mr. Arneault lived and worked in West Virginia. Other than residing in the couple's Michigan home while Mr. Arneault toiled in West Virginia, Mrs. Arneault had nothing to do with MTR Gaming, even long after the children had gone to college.

The record is also undisputed that much of MTR's success was due to Mr. Arneault's considerable efforts. The evidence was undisputed that Mr. Arneault is not merely an employee of MTR. He is president, chief executive officer, and chairman of the board of directors. He is also the spokesman and public persona of the corporation. SEC Rule 405 defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Mr. Arneault is the single largest shareholder of MTR. Every racing and gaming commission in every state in which MTR does business requires him to become licensed as a control person. Wells Fargo Bank conditions MTR's credit facilities on the company maintaining "key man" life insurance on Mr. Arneault in the amount of $8 million. The family court found that Mr. Arneault nearly single-handedly created the gaming industry in West Virginia. Plainly, Mr. Arneault's role in the success of MTR Gaming has been remarkable.

Essentially, Mrs. Arneault makes a "community property" argument, contending that because she was Mr. Arneault's long-time wife, she is automatically entitled to one-half of the stock of a corporation that Mr. Arneault built irrespective of their relative contributions to the corporation.

West Virginia, however, is *not* a "community property" state. Rather, West Virginia is an "equitable distribution" state in which its legislature has prescribed various factors to be considered in making, not an "equal" distribution of marital property, but an "equitable" distribution, based primarily upon the parties' relative contributions.

In Syllabus Point 2 of *Miller v. Miller,* 216 W.Va. 720, 613 S.E.2d 87 (2005), this Court recently reiterated that " 'Equitable distribution under W. Va.Code, 48–2–1, et seq., is a three-step process. The first step is to classify the parties' property as marital or non-marital. The second step is to value the marital assets. The third step is to divide the marital estate between the parties in accordance with the principles contained in W. Va.Code, 48–2–32.' Syllabus point 1, *Whiting v. Whiting,* 183 W.Va. 451, 396 S.E.2d 413 (1990)." At issue in this case are both the second and third steps. As to the third step, division, the equitable distribution statute plainly supports the unequal distribution made in this case by the family court.

*W.Va.Code,* 48–5–610(a) provides, "When the pleadings include a specific request for specific property or raise issues concerning the equitable division of marital property, the court shall order such relief as may be required to effect a just and equitable distribution of the property and to protect the equitable interests of the parties therein." (Emphasis added.) It is because of the "equitable" nature of the division of marital property that this Court affords substantial deference to the family court judge. As long as a family court judge articulates adequate evidentiary support for an unequal, but equitable distribution of the marital estate, this Court will not interfere with the exercise of discretion in making such distribution. *See* Syllabus Point 10, *Pearson v. Pearson,* 200 W.Va. 139, 488 S.E.2d 414 (1997) ("An order directing a division of marital property in any way other than equally must make specific reference to factors enumerated in § 48–2–32(c), and the facts in the record that support application of those factors." Syllabus Point 3, *Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988).' Syl. Pt. 6,

*Wood v. Wood,* 184 W.Va. 744, 403 S.E.2d 761 (1991).").

Formerly in *W.Va.Code,* 48–2–32(c), the equitable distribution factors are now found in *W.Va.Code,* 48–7–103 as follows:

In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:

(1) *The extent to which each party has contributed* to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:

(A) Employment income and other earnings; and

(B) Funds which are separate property.

(2) *The extent to which each party has contributed* to the acquisition, preservation and maintenance or increase in value of marital property by monetary contributions, including, but not limited to:

(A) Homemaker services;

(B) Child care services;

(C) Labor performed without compensation, or for less than adequate compensation, in a family business or other business entity in which one or both of the parties has an interest;

(D) Labor performed in the actual maintenance or improvement of tangible marital property; and

(E) Labor performed in the management or investment of assets which are marital property.

(3) *The extent to which each party expended his or her efforts during the marriage* in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, including, but not limited to:

(A) Direct or indirect contributions by either party to the education or training of the other party which has increased the income-earning ability of such other party; and

(B) Foregoing by either party of employment or other income-earning activity through an understanding of the parties or at the insistence of the other party.

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property.

As held in the family court judge's order, Mrs. Arneault did almost nothing to refute the substantial evidence presented by Mr. Arneault which supported the thirty-five/sixty-five division of the stock. Consequently, there is a paucity of discussion in the majority opinion regarding her contributions to the marriage or the corporation.

No details are provided about Mrs. Arneault's contributions to MTR Gaming because Mrs. Arneault made no contributions to MTR Gaming. Few details are provided about Mrs. Arneault's contributions to the marital home and child rearing because third parties provided many housekeeping and childcare services, and despite Mr. Arneault's business travel, he shared the parenting duties. There is no evidence that Mrs. Arneault ever sacrificed her career for Mr. Arneault's. Instead, as was noted, Mr. Arneault's career involved great sacrifice on his part in leaving the marital residence to earn a living which allowed Mrs. Arneault to enjoy a comfortable lifestyle and to pursue her far less lucrative business interests. In contrast to the overwhelming evidence of Mr. Arneault's sacrifices, there was *no* evidence of Mrs. Arneault's sacrifices.

Rather, Mrs. Arneault took the position that as Mr. Arneault's long-time wife, she was automatically entitled to one-half of everything, including the subject stock, and contrary to this Court's previous cases, she argues that the Section 103 factors apply only "in some extraordinary circumstance" or in "peculiar cases."

The statute, of course, does not require a finding that a case is "extraordinary" or "peculiar" before a court can find facts warrant-

ing an equitable distribution that is not equal. If the legislature had so desired, it surely could and would have done so. Rather, the legislature provided the factors set forth in Section 103 as the *measuring stick* for rebutting the presumption of equal distribution. As long as the law of this State includes the Section 103 factors, each and every divorce litigant is entitled to attempt to rebut the presumption of equal distribution. This Court, in turn, should not disturb a finding that a presumption has or has not been rebutted unless it finds that the lower court abused its discretion in applying the Section 103 factors to the particular facts of each case.

Once a litigant, like Mr. Arneault, rebuts the presumption of equal division by demonstrating that the evidence satisfies the statutory criteria for an unequal division, the burden shifts to the other party to adduce evidence that the statutory criteria support an equal division. In this case, rather than presenting any evidence, Mrs. Arneault essentially argued and continues to argue for "judicial nullification" of the equitable distribution statute in favor of fifty/fifty presumption that can never be rebutted. Mrs. Arneault likens a marriage to a law partnership whereby both parties are entitled to share in the good fortune of the other. Law partnerships, however, are governed by written partnership agreements that force whatever division of good or bad fortune the parties decide or other under governing statutory law.

The West Virginia Legislature, however, has not created a "marital partnership" in which each partner, whatever their relative contributions, is always entitled to share equally in the good fortune of the other. Rather, as this Court stated in *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995), "Thus to be equitable, the division need not be equal, but as a starting point, equality is presumptively equitable." (Emphasis added.) The *Burnside* Court further noted in footnote 24 that:

> [U]nder this statute there is no absolute requirement that each item of marital property be distributed on an equal basis; rather, property acquired during the marriage may be distributed in a manner consistent with the statutory policy that re-

flects fairness and equity ... to mould a decree appropriate to a given situation with equity being its ultimate goal.

Even one of Mrs. Arneault's own attorneys, while a Justice on this Court, filed a dissenting opinion in which he advocated that an *unequal distribution of a family farm was appropriate under the circumstances presented*. See *Tallman v. Tallman*, 183 W.Va. 491, 501, 396 S.E.2d 453, 463 (1990) (Neely, C.J., dissenting); *see also, Metzner v. Metzner*, 191 W.Va. 378, 388, 446 S.E.2d 165, 175 (1994) (Neely, J., concurring in part and dissenting in part) ("Now that the goose is cooked, Mrs. Metzner wants her share, but Mrs. Metzner did not pay for the goose, the fuel to cook it, the sauce to flavor it or even the pot to cook it in. The majority awards Mrs. Metzner the tender breast of the goose merely because the goose happened to wander into Mr. Metzner's yard while Mr. and Mrs. Metzner were still married.").

In the instant case, there is sufficient evidence of record to support the family court's decision. With the concurrence of the parties, the family court bifurcated the case and conducted a two-day mini-trial devoted exclusively to the equitable distribution issue. The parties were not limited as to time or the number of witnesses they could present. The judge even held court over the weekend to accommodate the parties' desire for a swift resolution. Unquestionably, Mrs. Arneault had her day in court with respect to the distribution issue. The record simply does not support Mrs. Arneault's contention that theirs was a "standard marriage." More importantly, the record supports the family court's conclusion that Mr. Arneault's sole and unique contributions to the success of MTR, and Mrs. Arneault's lack of involvement in the business, supported a thirty-five/sixty-five distribution of its stock.

In a thirty-page February 20, 2004 order, the family court detailed the overwhelming testimony of credible witnesses concerning Mr. Arneault's impact on MTR and its prospects, as well as the gaming and tourism industry in West Virginia in general. Louis Southworth, a well-known Charleston attorney and lobbyist, testified that Mr. Arneault's work was "primarily responsible" for

the various pieces of legislation over a period of years that permitted gaming in West Virginia, "allowing MTR to skyrocket." Indeed, Mr. Southworth testified that "but for .him [Mr. Arneault], (the 1994 legislation) would not have passed."

The court heard testimony from Rose Mary Williams, MTR's director of racing and an employee of Mountaineer Park since 1977, who explained that once gaming legislation was passed, it was Mr. Arneault's strategy to market the resort through "infomercials" that was the "turning point in the company's success." The testimony was undisputed that when he took over as president and CEO in April of 1995, the company had revenues of $25 million and that, as of 2004, the company had some $300 million in revenue, and that Ted Arneault was primarily responsible for the company's meteoric growth.

For her part, Mrs. Arneault agreed that she had absolutely no involvement in the company's business, and that she made no contributions, by virtue of non-monetary means, to the success of the business. "She was rarely in the State of West Virginia, and thus rarely at the site of the casino/resort." No matter how many times Mrs. Arneault alleges in her petition that she was a "corporate spouse" who made substantial sacrifices to ensure the success of her husband's business, it cannot make it true, and the family court's allocation of stock cannot be said to be unjust in light of her lack of contribution.

While married to Mr. Arneault, Mrs. Arneault reaped the benefits of his success and would be a multi-millionaire under the judgment of the Circuit Court of Hancock County. It is simply inequitable for her also to receive fifty percent of the stock in light of her negligible contribution to the success of the company, merely as the result of her status as his wife. MTR is not a "lottery ticket," the cost of which was purchased with marital funds and the equal division of which would be equitable. Rather, the overwhelming evidence was that Mr. Arneault was the heart and soul of MTR and it was his extraordinary personal efforts that built the company into what it is today. Even Mrs. Arneault's own expert, Dan Selby, testified as follows:

He's actually quite an amazing evolving human, I mean, he's got tremendous demeanor, he's developed incredible expertise in numerous fields, he's· developed what seems to me to be a very learned financial background that he is able to deal in all sections of level of financial indices. He's dealing with bankers, he's dealing with the public, he's dealing with managerial aspects. He's developed a personage that, obviously, from what I have heard in testimony, is a—is an incredible salesman. So in essence, he's developed an intellectual cap—capital and expertise through an evolutionary stage. It looks like he's exercised his capacity wonderfully.

On the one hand, Mrs. Arneault provided homemaker services over the years. On the other hand, even Mrs. Arneault conceded that Mr. Arneault was a devoted, involved father, coached his son's athletic teams, and, despite necessary business travel, made it home frequently and nearly every weekend while either child was living at the family home. Based upon all of the evidence, the family court wisely determined that the thirty-five/sixty-five split was "equitable," based upon the relative contributions of the parties, and this Court should not interfere with this discretionary judgment.

While it is true that the family court focused on the factors set forth in Sections 103(1)(A) and (2)(E)—how could she not, given Mr. Arneault's monetary contribution was seventy-two times that of Mrs. Arneault and he managed all of the finances, including obtaining the loans necessary to exercise the stock options in the first place—it is equally clear that the family court judge carefully considered each of the statutory factors. The judge sifted and weighed the evidence. Some factors favored Mr. Arneault; others favored Mrs. Arneault; some such as Section 103(1)(b) had no bearing at all. The family court judge even noted that had she limited her consideration to the factors in 103(1)(a) and (2)(E), Mr. Arneault would receive virtually all of the marital estate. The family court determined, based upon some of the other Section 103 factors, that Mrs. Arneault had made "substantial" contributions to the

marriage and therefore awarded her a "substantial" portion of the marital estate.

The Section 103 factors require a determination based on the totality of the circumstances. Here, Mr. Arneault's direct responsibility for the acquisition, maintenance, and appreciation of the MTR stock through his sole efforts, coupled with Mrs. Arneault's complete absence from the scene at MTR, Mr. Arneault's sharing of the household and parenting duties, and encouragement and support (financial and otherwise) for Mrs. Arneault's consulting business were substantial factors weighing in his favor.

In considering the merits of Mrs. Arneault's appeal, this Court should consider the following factors, used by courts in cases around the country in similar circumstances:

(1) Mrs. Arneault failed to introduce any evidence that she made major contributions to the marital estate as a result of her efforts as a "corporate spouse;"

(2) She failed to introduce any evidence that she was a full-time homemaker;

(3) She failed to introduce any evidence that she routinely accompanied Mr. Arneault to conventions and social gatherings of MTR;

(4) She failed to introduce any evidence that she was so involved in the dealings of MTR that for all intents and purposes she was considered an employee;

(5) She failed to introduce any evidence that she entertained MTR customers and other business associates in social and business settings;

(6) She failed to introduce any evidence that she suffered an increased workload and extensive social duties as a result of Mr. Arneault's work at MTR;

(7) She failed to introduce any evidence that she hosted events related to the business of MTR;

(8) She failed to introduce any evidence that her entertainment duties expanded with Mr. Arneault's corporate responsibilities;

(9) She failed to introduce any evidence that she traveled extensively with Mr. Arneault to numerous cities for business purposes;

(10) She failed to introduce any evidence that she in any way was a sounding board for Mr. Arneault, giving advice and guidance to him;

(11) She failed to introduce evidence that during the course of the marriage Mr. Arneault frequently shared information with her about business dealings, daily experiences, and/or asked for advice in a wide variety of circumstances;

(12) She failed to introduce any evidence that she played any role (significant or otherwise) in the financial aspects of MTR or Mountaineer Park, in addition to serving as a "homemaker;"

(13) She failed to introduce any evidence that she performed all the typical duties of a wife, parent, and homemaker and still demonstrate that she made an actual economic contribution to the marital estate; and

(14) She failed to introduce any evidence that there is a direct link between her business efforts and the ultimate value of the MTR stock.

It appears that Mrs. Arneault had a full and fair opportunity to present such evidence, but did not do so. She gave the family court virtually nothing, other than the talismanic argument that as Mr. Arneault's wife, she was entitled to fifty percent of everything. Mrs. Arneault certainly had competent counsel who could have developed a record to refute Mr. Arneault's contention that he was entitled to more than fifty percent of the MTR stock. Instead of evidence, however, she requested this Court's intervention in the face of a clear and unambiguous statute to ignore the evidence and award to her what would be a windfall.

What the legislature has instructed is that when the efforts of one spouse are disproportionate to the efforts of another spouse with respect to the acquisition of marital assets, the efforts of the first spouse are *not to be ignored* in the *equitable* distribution of the marital assets; otherwise, slough and neglect would prevail over industry and diligence. The family law judge recognized, based on overwhelming evidence, that Mr. Arneault's contributions to the acquisition and appreciation of the stock were so profound and unique and Mrs. Arneault's contributions were relatively negligible as to justify a rela-

tively unequal distribution of the subject stock.

Because Mrs. Arneault's contribution to the subject stock was negligible, she understandably attempted to leverage whatever homemaker services she provided that were not provided by housekeepers, nannies, and other service providers. Mrs. Arneault's reliance on *Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382 (1996), however, for the proposition that "workplace" work and "home place" work must be valued equally, even where they are not equal, is misplaced. The family court's order soundly and thoroughly distinguishes that case. As the family court noted, the *Mayhew* court acknowledged that the two types of work are equated only if the court does not find that one or more of the Section 103 factors requires a contrary finding, thus rebutting the presumption. Therefore, the family court reasoned, *Mayhew* is consistent with Justice Cleckley's decision in *Burnside*, which, while acknowledging that in general equitable distributions will be equal, left ample room under the Section 103 factors to alter that distribution.

*Mayhew* is further distinguishable on the facts. In *Mayhew*, the wife during the course of the marriage would take the children to the husband's business (a car dealership), cook, and take dinner to the husband when he had to work late, was active in community organizations to aid the husband's business, and actually worked at the dealership without compensation prior to the birth of the children. In other words, Mrs. Mayhew was the proverbial "corporate spouse." Mrs. Arneault was not. Indeed, she rarely set foot in West Virginia. This irrefutable fact is at the heart of the family court's decision.

There are spouses, both husbands and wives, whose contributions to the success of their spouse's businesses are more or less, particularly considering their other contributions to the marriage, such as homemaker services, equal. For those spouses, they absolutely deserve a fifty percent distribution of the value of those businesses. Where one spouse, however, as in the instant case, is so instrumental in building a business, and the other spouse's contributions are relatively insignificant, an unequal distribution of the value of that business is appropriate. Had

Mrs. Arneault, in reality, served the role of "corporate spouse" that she alleges, she might be entitled to half of the value of MTR stock.

In most cases, in the ordinary circumstances of divorce—which is that neither party can afford it—a relatively strict application of the presumption of equal distribution may be more appropriate. "Let both parties suffer equally" is not an unreasonable principle. But when the "super rich" start dividing things up, and even a person with the shorter end of the stick will be "rich" after a divorce, then it is less harmful to let the equities have their way. The majority opinion is therefore additionally deficient in its discussion of equitable distribution because it pretends that the enormous wealth that Mr. Arneault has amassed through his work is just like the "house and pension and savings" that ninety-nine percent of us have.

The majority would have done well to consult a 2001 article in the *Journal of the American Academy of Matrimonial Lawyers* by Mosby Kisthardt and Nancy Levit, "High Income/High Asset Divorce: An Annotated Bibliography," listing scores of scholarly articles. Hopstein, Weiner and Marrone take on the challenge in another *Journal of Matrimonial Lawyers* article in 2001: "The Big Case: Issues in High Income/High Asset Cases." Another article, "Wealthy Wives' Tales," by Debra Baker, appears in the 1998 *ABA Journal*. The majority opinion could, of course, have cited to or reflected a study of the materials in these articles, if it wanted to recognize the super rich status of the Arneaults. But not a glimmer of such recognition appears in the opinion. We could be talking about a family that owns a small dry cleaning business in Webster Springs! A review of these articles suggests that where one party to a marriage has by extraordinary personal effort amassed great wealth, while the other party's contributions to the amassment of wealth have not been of an equally extraordinary nature, the party principally responsible for the existence of the wealth should receive a somewhat greater share.

This dissent will conclude by quoting a sentence from the majority opinion that illustrates the kind of superficial and speculative

rhetoric upon which the majority purports to ground its overturning of a well-reasoned lower court decision that is thoroughly supported by evidence and law.

The majority says:

Mrs. Arneault earned a professional license and a graduate degree after the marriage commenced. It is *very conceivable* that this accumulation of knowledge, after the commencement of the marriage, *led to the development of Mr. Arneault's innate abilities.* [emphasis added].

To this caliber of judicial reasoning, the only possible response is amazed speechlessness. Accordingly, I dissent.[1]

BENJAMIN, J., concurring.

(Filed Dec. 15, 2006)

It has been said that "[m]otherhood is not a part time job." *Brown v. Brown*, 925 So.2d 662, 666 (La.Ct.App.2006). Yet that is precisely the sentiment the dissenters have expressed in discounting the contributions Ms. Arneault made to the parties' marriage of 35 years—contributions which freed Mr. Arneault of his obligations to home and family and allowed him to make his weekly travels to West Virginia to develop MTR into the successful institution it is today. Because the majority properly considers Ms. Arneault's role in maintaining the marital residence and raising the parties' children during Mr. Arneault's extensive absences and awards her equitable distribution of one-half of the marital estate in recognition of her substantial contributions to the parties' marriage, I respectfully concur with the majority's opinion in this case.

A. Equitable Distribution

The dissenters first take issue with the majority's decision to equitably distribute the parties' marital estate and to accomplish this end by awarding each party one-half thereof. Succinctly stated, my dissenting colleagues appear to believe that because Ms. Arneault did not join her husband in his weekly travels to West Virginia and did not work outside the home, and because her *only* contribution to the 35 year marriage was to single-handedly raise the parties' two children and to maintain the parties' marital home during Mr. Arneault's routine absences, theirs was not an equal partnership, and, thus, Ms. Arneault is not entitled to one-half of the marital estate, but rather should receive a more meager percentage of the parties' assets. *See, e.g.,* Dissenting opinion of J. Starcher, at p. 738. This line of reasoning, so dismissive of a woman who in marriage served as the wife of a successful executive, and as the at-home mother to their children and as the spouse who maintained the parties' marital home, is, frankly, archaic. It is also completely contrary to the established law of equitable distribution in this State.

W. Va.Code § 48–7–103 (2001) instructs a court how to accomplish the equitable distribution of a marital estate when there is no agreement providing for such a division of the parties' property:

In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:

(1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions, including, but not limited to:

(A) Employment income and other earnings; and

(B) Funds which are separate property.

(2) The extent to which each party has contributed to the acquisition, preservation and maintenance or increase in value of marital property by nonmonetary contributions, including, but not limited to:

(A) Homemaker services;

(B) Child care services;

(C) Labor performed without compensation, or for less than adequate compensation, in a family business or other business entity in which one or both of the parties has an interest;

(D) Labor performed in the actual maintenance or improvement of tangible marital property; and

---

1. I do not address other issues discussed in the majority opinion.

(E) Labor performed in the management or investment of assets which are marital property.

(3) The extent to which each party expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party, including, but not limited to:

(A) Direct or indirect contributions by either party to the education or training of the other party which has increased the income-earning ability of such other party; and

(B) Foregoing by either party of employment or other income-earning activity through an understanding of the parties or at the insistence of the other party.

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property.

W. Va.Code § 48-7-103. In performing such an evaluation, a court is directed to consider (1) the spouses' monetary contributions; (2) the spouses' nonmonetary contributions; (3) the efforts of the spouses to increase their own, or their partner's, income-earning potential; and (4) the spouses' depletion of marital assets. Id. See also Syl. pt. 1, Somerville v. Somerville, 179 W.Va. 386, 369 S.E.2d 459 (1988) (interpreting and applying plain language of statute before current recodification). Pursuant to the express language of W. Va.Code § 48-7-103, no greater or lesser weight is accorded to monetary versus nonmonetary contributions to the marital estate. Thus, a court should give the same consideration to unpaid homemaker and child care services performed within the home as it does to income-earning work done outside the home.

The directives of this standard to accord equal weight to nonmonetary homemaker and child care services have also been recognized in our cases applying this statute. Primary among these decisions is *Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382 (1996), *overruled on other grounds by Mayhew v. Mayhew*, 205 W.Va. 490, 519 S.E.2d 188 (1999), wherein we specifically held, in Syllabus point 7, that,

[u]nder equitable distribution, the contributions of time and effort to the married life of the couple-at home and in the workplace-are valued equally regardless of whether the parties' respective earnings have been equal. Equitable distribution contemplates that parties make their respective contributions to the married life of the parties in that expectation.

This Court similarly concluded in the cases of *Raley v. Raley*, 190 W.Va. 197, 437 S.E.2d 770 (1993) (per curiam), and *Wood v. Wood*, 184 W.Va. 744, 403 S.E.2d 761 (1991) (per curiam), that homemaker and child care services, albeit noneconomic, constitute significant and substantial contributions to a marital estate to be considered in determining the equitable distribution of the parties' assets. *See Raley v. Raley*, 190 W.Va. at 199-200, 437 S.E.2d at 772-73 (concluding that "general contributions, rather than economic contributions [a]re to be the basis for [the] distribution" of a marital estate); *Wood v. Wood*, 184 W.Va. at 755, 403 S.E.2d at 772 (finding that, as compared with husband's monetary contributions to marital estate resulting from his employment earnings, wife's "non-monetary . . . contribution[s] in child care and homemaker services" were "equally substantial").

Nevertheless, the dissenters conveniently overlook the plain statutory language of W. Va.Code § 48-7-103 and ignore this Court's established precedent applying this standard to equitably distribute marital estates and, instead, decide that more weight should be given to Mr. Arneault's work performed outside the home because he earned such a vast income and amassed the majority of the economic wealth that now forms the parties' marital estate. In doing so, my dissenting colleagues correspondingly have devalued Ms. Arneault's substantial unpaid in-home employment, which unquestionably afforded Mr. Arneault the luxury to pursue his own professional aspirations, because her home-

maker and child care services did not earn her a paycheck. *See* Dissenting opinion of J. Starcher, at p. 741 (suggesting that because Ms. Arneault "failed to introduce any evidence that she performed all the typical duties of a wife, parent, and homemaker *and still demonstrate that she made an actual economic contribution to the marital estate*," she should receive less than one-half of the marital estate (emphasis added)). This reasoning simply is not supported by the law of this State. It also demeans the difficult choice which families must often make between a parent staying home with the children or a parent pursuing a career. Because the majority opinion understands and correctly applies the legal standard for equitably distributing marital property, I concur in their decision.

### B. In Kind Distribution of Marital Stock Holdings

Another point raised by one of my dissenting colleagues concerns the majority's decision to award Ms. Arneault her one-half share of the parties' stock holdings in kind as stock rather than to grant her the monetary equivalent thereof. The majority concludes that only an award of the actual stock, itself, would satisfy Ms. Arneault's entitlement to one-half of the marital estate because the parties did not possess assets sufficient to award her the monetary equivalent thereof. By contrast, however, the dissenter predicts doomsday will occur when Ms. Arneault receives her distribution of MTR stock because public confidence in the value of MTR stock will decline and force scores of MTR employees into joblessness. *See* Dissenting opinion of J. Maynard, at p. 736. Not only is this supposition mere speculation, but this line of reasoning also fails to consider that it is not in Ms. Arneault's best interests to jeopardize the value of MTR stock insofar as her assets similarly would be substantially devalued.

In any event, however, the well-reasoned majority opinion thoroughly explains that Ms. Arneault should receive her portion of the stock in kind, rather than property in lieu thereof, because the marital estate does not possess any other property to distribute to her. Accordingly, I will not further belabor this point other than to reiterate that, under the facts of this case, an award of stock in kind is the only means by which to achieve an *equitable* distribution of the parties' marital estate because a purported distribution of equivalent property is a legal fiction which could not approach the value of assets to which Ms. Arneault is entitled.

### C. Clarification

Lastly, I would be remiss if I did not clarify a final misapprehension of the majority opinion expressed by one of the dissenters in his separate dissenting opinion. In chastising the majority for basing their decision on "superficial and speculative rhetoric," the following passage is purportedly quoted from the majority's opinion:

> **Mrs.** Arneault earned a professional license and a graduate degree after the marriage commenced. It is *very conceivable* that this accumulation of knowledge, after the commencement of the marriage, *led to the development of Mr. Arneault's innate abilities.*

Dissenting opinion of J. Starcher, at p. 743 (italicized emphasis in original; bold emphasis added). The dissent analyzes this passage by expressing that "the only possible response [to this line of reasoning] is amazed speechlessness." *Id.*, at pp. 742–43.

I, too, would have expressed "amazed speechlessness" had this been an accurate recitation of the majority opinion in this case. It is not. A considered reading of the majority's opinion demonstrates that the majority were discussing *Mr.* Arneault's acquisition of his advanced degree after the parties' marriage and the resultant benefit to *Mr.* Arneault's career resulting therefrom. To more accurately quote from the majority's opinion in this regard,

> **Mr.** Arneault earned a professional license and a graduate degree after the marriage commenced. It is very conceivable that this accumulation of knowledge, after the commencement of the marriage, led to the development of **Mr.** Arneault's innate abilities.

Majority opinion, at p. 728 (emphasis added). The passage speaks for itself.

### D. Conclusion

It has been said that "[w]e honor motherhood with glowing sentimentality, but we

don't rate it highly on the scale of creative occupations." Leontine Young, Introduction to *Life Among the Giants* (1965). Truer words could not be spoken of the view expressed by the dissenters. In dissenting from the majority opinion in this case, I fear my colleagues perpetuate the disdain to which mothers who do not work outside the home are all too often subjected. Rather than dismissing such nonmonetary contributions as being insignificant or less important than those occupations which receive a paycheck, however, the West Virginia Legislature and this Court both have acknowledged that a parent's work inside the home *is* a substantial contribution to the marital estate which a husband and wife have amassed. In fact, such nonmonetary contributions are highly valued and appreciated both for children and as supporting and fostering an environment that permits the work-outside-the-home spouse to do so. *See* W. Va.Code § 48–7–103; Syl. pt. 7, *Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382. Such a result is indeed equitable, particularly in light of the never-ending demands faced by the mother (or father) who works inside the home:

> No ordinary work done by a man is either as hard or as responsible as the work of a woman who is bringing up a family of small children; for upon her time and strength demands are made not only every hour of the day but often every hour of the night. She may have to get up night after night to take care of a sick child, and yet must by day continue to do all her household duties as well . . . .

Theodore Roosevelt, On American Motherhood, Speech before the National Congress of Mothers (Mar. 13, 1905). Because the majority correctly addresses and resolves the issues in this case, I respectfully concur with the opinion of the Court.